## TITE et al. v. STATE TAX COMMISSION.

No. 5723. Decided May 15, 1936. (57 P. [2d] 734.)

*J. Quill Nebeker,* of Ogden, for plaintiffs.

*Ned Warnock,* of Salt Lake City, for defendant.

WOLFE, Justice.

This case involves the constitutionality of a part of R. S. Utah 1933, 93-1-5, as amended by chapter 17, Second Special

Session, Laws of Utah 1933, dealing with the cigarette and oleomargarine tax. The plaintiffs, doing business under the firm name of Wilson Bros. Grocery Company in Ogden, Utah, dealt in cigarettes at retail. On the 27th day of July, 1935, one G. H. Jones, an inspector of the state tax commission of Utah, went to the plaintiffs' place of business, searched it, and claims to have found ten cartons of Lucky Strike cigarettes; that none of said cigarettes were stamped, apparently, it is claimed, showing that no tax had been paid thereon. He also found some canceled cigarette stamps. On the 29th day of July, 1935, plaintiffs received a letter from the state tax commission signed by Irwin Arnovitz, Chairman, ordering the said plaintiffs to appear before the commission on August 6, 1935, as thereafter changed, at the county courthouse, Weber county, Utah, to show cause why they should not be required to pay the penalty for failure to properly affix and cancel said cigarette stamps as provided by 93-1-5, R. S. Utah, 1933, as amended by chapter 17, Second Special Session, Laws of Utah 1933. Plaintiffs appeared and objected to the introduction of any evidence on the ground that the commission had no jurisdiction because the procedure was unconstitutional.

The proceedings were held under the purported authority of 93-1-5, R. S. Utah 1933, as amended by chapter 17, Second Special Session, Laws of Utah 1933, reading, in so far as material here, as follows:

"Any person failing properly to affix and cancel stamps to the products enumerated in Section 93-1-1, as provided herein or by regulations promulgated by the state tax commission as provided in this chapter, shall be required to pay as a part of the tax imposed hereunder, a penalty of not less than ten dollars ($10) nor more than two hundred ninety-nine dollars ($299) for each offense, to be assessed and collected by the state tax commission as provided in Section 93-1-15. Each article, package or container not having proper stamps affixed thereto as herein required shall be deemed a separate offense. The presence of any package or container in the place of business of any person required by the provisions of this chapter to

stamp the same shall be prima facie evidence that they are intended for sale and subject to tax under this chapter."

The commission took evidence and on August 13, 1935, rendered its decision finding plaintiffs guilty of violating the laws of the state of Utah relative to the stamping of cigarettes and placed a penalty on them in the sum of $250, giving one week to pay the same.

Chapter 17, Second Special Session, Laws of Utah 1933, amending 93-1-15, provides that the penalty shall be collected as specified in 80-13-54 and 80-13-55, R. S. Utah 1933. These sections in brief provide: 80-13-54, that the tax commission may issue a warrant for the penalty and cause the same to be served by the sheriff commanding him to levy upon and sell real and personal property in a similar manner to a writ of execution. 80-13-55 authorizes the entering of the warrant by the clerk of the district court in the judgment docket after which it shall become a lien on all real property owned by the purported violators, and the sheriff then shall proceed to enforce the judgment lien the same as an execution.

The application herein for the writ of prohibition is founded solely upon the contention that the tax commission had no power to determine a penalty for the failure to affix stamps because that part of 93-1-5 of chapter 17, Second Special Session, Laws of Utah 1933, which attempted to give these powers to the commission, is unconstitutional in that the Legislature attempted to give to the commission powers which were purely judicial and could be exercised only by a court, and that if not judicial, an unwarranted delegation of legislative power. This power claimed to be judicial only was the power to hear the evidence and fix a penalty within the limits prescribed by the Legislature, i. e., between $10 and $299 for each "offense," upon which a warrant could issue to the sheriff under 80-13-54, R. S. 1933. The question of whether the commission had this power to initiate and proceed with the hearing at all and not whether it properly proceeded or properly found, was the question presented.

The plaintiffs argue not that the Legislature has not power to provide that some tribunal shall have authority to hear and fix a penalty for the violation of the cigarette law in failing to affix stamps, but that such power can be given only to the courts and not to an administrative tribunal. A few preliminary observations about judicial, executive, and legislative powers may serve to give a clearer idea of this oft vexed question of what are judicial and what are administrative powers. In the remoter past of English constitutional history, these powers were not separated as to agencies which could exercise them. Says Maitland in his "Constitutional History of England" (1st Ed.) p. 55:

"We turn to the central government, the king, and his councils. This we are wont to regard as the main theme of constitutional law. We have here, however, postponed it, for it can hardly be understood without some preliminary knowledge of the land law and of the local institutions. Now at the end of Edward's reign [Edward I who just preceded William the Conqueror] we find several different central institutions. In the first place, there is the kingship; this is the center of the center. Then there is the assembly of the three estates of the realm, clergy, lords and commons, to which the name *parliamentum* is coming to be specifically appropriated. Then again the king has a council (concilium) which is distinct from parliament, and he has high officers of the state, a chancellor, treasurer, constable, marshal and so forth. Then again he has courts, courts *which in a peculiar sense are his courts* [these italics ours]: there is the King's Bench, the Common Bench, the Exchequer. All these are now distinct and have different functions; but looking back a little way we see that they have not always been distinct, that a difference, for instance, between the king's council (concilium Regis) and the king's court (curia Regis) has but slowly been established."

The growth of the English Constitution is an evolution passing roughly through the stages of an early slow amalgamation of institutions of local governments—shires and counties—which were at one time independent states coalesced into the Kingdom of England by the Norman Conquest, to one of increasing power of the King with its surges and resurges, and finally into the gradual and slow derogation of the powers of the King. The institutional powers

theoretically residing in the King and the power which he wielded were not always commensurate because the latter depended largely on the personality of the King, whether he was weak or strong. From 1066 to 1154 the process of amalgamation was marked; from 1154 to 1216 is the period of usurpation of power in the King; from 1216 on down is the period of rise of the barons in opposition to the King and then of the commons as against the barons and the King with their advances and recessions in the acquisition of power. While this history is remote and appears to be far afield from the question we are investigating, it has, in reality, a material bearing. The point to be noted is that for many years there was no separation of executive, judicial, or legislative powers. They were exercised even by the same agencies. Says Rawle in the Third Revision of Bouvier's Dictionary, p. 1114, under his treatment of executive power, "As is pointed out by a recent writer all governmental power was formerly united in the monarchs of the middle ages." In England the King was never quite free or at least never chose to be quite free from his council. At first, it consisted of certain of the tenants in chief—his immediate military vassals. "Thrice a year," says the Saxon Chronicle, "King William wore his crown every year he was in England; at Easter he wore it at Winchester; at Pentecost at Westminster and at Christmas at Gloucester; and at these times all the men of England were with him,—archbishops, bishops, and abbots, earls, thegns and knights." Later, says Maitland, "A smaller body collects around the king, a body of administration selected from the ranks of the baronage and of the clergy. * * * Under Henry I this body becomes organic; the orderly routine of administration begins even to check the king's power. * * * This body when it sits for financial purposes constitutes the Exchequer, so-called from the chequered cloth which lies on the table, convenient for the counting of money. *Also it forms a council and court of law for the king, it is curia Regis, the king's court,* and its members are *justiciarii,* justiciars or justices of this court."

It is somewhat too much of a simplification to say that this body was the precursor of the House of Lords and the second circle around the King,—the witenagemat, the harbinger of the House of Commons. With all the struggles arising from the assumptions of the King and opposition thereto, ranging mostly about the matter of taxation, and their consequent institutional developments, the geneology is not clear. Stubbs, in his Constitutional History of England, states:

"The material elements of constitutional life are inherent in the nation itself, in its premature institutions and early history. The regulative and formative influences have proceeded mainly from the authority of the kings, the great organizers of the Norman and Plantagenet lines. The impulse and character of constitutional progress have been the result of the struggles which may be termed the constitutional opposition. It is so much easier, in discussing the causes and stages of a political contest, to generalize from the results than to trace the growth of the principles maintained by the actors, that the historian is in some danger of substituting his own formulated conclusions for the programme of the leaders, and of giving them credit for a far more definite scheme and more conscious political sagacity than they would ever claim for themselves. * * * The march of constitutional progress is so steady and definite as to suggest everywhere the idea that it was guided by some great creative genius or some great directive tradition. Yet it is scarcely ever possible to distinguish the creative genius; it is impossible to assign the work of any single mind or series of minds, and scarcely easier to trace the growth of the guiding tradition in any one of the particulars which it embodies."

All of this seems to point to the proposition that in early history the three types of powers, judicial, legislative, and executive, were exercised fundamentally by the king, there was no separation and no need of separation. He exercised them through and with various agencies as experience, necessity, and development offered. Naturally there is an inherent difference in the pure function of forming or making a law and the pure function of executing it. The judicial function grew primarily from the necessity of deciding controversies which involved the function of construing laws. But certainly the function of construing laws also had to be

done by those executing laws. One cannot execute a law until he determines what the law means and calls for. The difficulty of separating these three functions has increased enormously with the growth of administrative bodies made necessary by the increasing complexity of our economic and social life.

It was Montesquieu in his Esprit des Lois who crystalized the theory of separation of powers to the degree we have it in our Federal and State Constitutions. But even here, as stated in Bouvier's Dictionary (Rawles 3d Rev.) p. 1114,

"The absolute independence of the three branches of government which was advocated by Montesquieu has not been found entirely practicable, and, although the threefold division of powers is the basis of the American Constitution, there are many cases in which the duties of one department are to a certain extent devolved upon and shared by the other."

In *Brown* v. *Turner,* 70 N. C. 93, the court said,

"[Athough] the executive, legislative and supreme judicial powers of the government ought to be forever separate and distinct, it is also true that the science of government is a practical one; therefore, while each should firmly maintain the essential powers belonging to it, it cannot be forgotten that the three co-ordinate parts constitute one brotherhood, whose common trust requires a mutual toleration of the occupancy of what seems to be a 'common cause of vicinage,' bordering the domains of each."

The more one cogitates on the nature of three powers, the more convinced he becomes of the proposition that many of the powers of each branch and especially of the judiciary are traditional, that is, handed down through the ages, rather than inherently different. Certain functions the courts exercised because they were first given to the courts or because they developed the machinery to handle them, and the person who presided over them was a specialist in the law, or a lawyer. Thus also, the trial of a criminal offense calling for a jury was a court function. The power to entertain applications for certiorari, injunction, manda-

mus, habeas corpus, trials between persons involving life, liberty, or property were court or judicial functions. The entertainment of a writ in the nature of an information of quo warranto was so exclusively a court function that even Parliament refused to exercise the power of determining whether a corporation had exceeded its prerogatives. See Angel and Ames on Corporations.

But so indistinct has become the line between even this traditional judicial power and executive functions that this court in the case of *Citizens' Club* v. *Welling, Sec'y of State,* 83 Utah 81, 27 P. (2d) 23, held that a law which gave him the power on hearing to forfeit the charter of a club was constitutional.

Our Department of Registration determines not only whether a physician should have a license, but whether he has violated the law so as to revoke his license. And exactly the same questions upon which revocation may depend, the courts have jurisdiction of in their aspect as a crime. An example is the alleged commission of an abortion by a doctor. The Industrial Commission must in the case of the death of an employee determine such questions as marriage status, employer-employee relationships, and thus construe and apply laws governing the making and the construction of contracts. These are exactly the same questions which courts must determine when those questions come up in suits as distinguished from the determination of whether compensation is payable. The question of whether the matter is judicial or administrative depends largely on the aspect in reference to which the question is presented. To make a sudden approach to the concrete problem at hand, the question of whether a person has violated a tax statute depends largely upon whether it is being considered in its aspect as a criminal violation of the tax act, in which case the courts only have the power to entertain the criminal suit, or in its aspect of whether the taxpayer owes a penalty for failure to pay the tax or for making a false return. It is not without the bounds of conception to think of a body, such as the

tax commission with administrative functions presided over by lawyers with statutorily provided mechanism for calling in the constitutional jury, having power to try a taxpayer for the crime of knowingly not paying a tax or making a false return. And if it were necessary to make it constitutional to call it a court, the Legislature might do that. In fact, the King's early council spoken of heretofore not only managed the exchequer, but went through the kingdom collecting taxes and at the same time heard complaints of the King's subjects about all sorts of matters. It was the King's tax commission and at the same time curia regis. However, that can hardly serve as a precedent for the case at bar. What we desire to illustrate is that judicial and administrative powers (part of the executive powers) do not, in our law, get their distinction altogether from the inherent nature of those powers, but from the fact that through long custom certain agencies exercised certain of those powers in a specific manner. These were the courts. Therefore, we think of those things done by the courts in the way the courts did them as judicial through tradition. But at one time they were done by agencies which exercised those powers together with other powers purely executive. In these latter days, therefore, we must be prepared to see that if some of the things that courts did in their traditional way are taken over by administrative bodies as part of their necessary administration of the subject-matter committed to them, such powers must be considered administrative when so exercised, which in fact they are. We cannot let the fact that because certain institutions traditionally exercised certain powers blind us from the further fact that those same functions when necessary to administration are just as truly administrative functions. In what has been said above, we do not mean to imply that there are not matters which involve questions which are distinctly for the judiciary and no other tribunal. What is meant to be said is that many legal questions are, in their solution, equally a matter for the judiciary or the administrative branch of the government depending upon the aspect which such ques-

tion assumes and the result which is to ensue upon the determination of the question.

In this case, 93-1-4, as amended by chapter 17, Laws of Utah 1933, Second Special Session, placed an excise tax on the sale of cigarettes. It was a function peculiarly within the province of the Legislature. The matter of administration was placed with the tax commission, a power proper to give it. The matter of fixing a penalty for nonpayment of the tax or for failure to affix stamps was a matter which the Legislature had plenary power to deal with. The duty of determining whether there was such failure was given to the administrative body, a function which the Legislature might itself perform or give to an administrative body. So far the functions given to the tax commission were entirely proper for the Legislature to delegate. It was not a delegation of essential legislative powers, but of powers to carry into effect the expression of the legislative will. In the case of *Oceanic Steam Navigation Co.* v. *Stranahan,* 214 U. S. 320, 29 S. Ct. 671, 677, 53 L. Ed. 1013, Chief Justice White said:

"In effect, all the contentions pressed in argument concerning the repugnancy of the statute to the due process clause really disregarded the complete and absolute power of Congress over the subject with which the statute deals. They mistakenly assume that mere form, and not substance, may be made by the courts the conclusive test as to the constitutional power of Congress to enact a statute. These conclusions are apparent, we think, since the plenary power of Congress as to the admission of aliens leaves no room for doubt as to its authority to impose the penalty, and its complete administrative control over the granting or refusal of a clearance also leaves no doubt of the right to endow administrative officers with discretion to refuse to perform the administrative act of granting a clearance, as a means of enforcing the penalty which there was lawful authority to impose. * * *

"But it is argued that even though it be conceded that Congress may, in some cases, impose penalties for the violation of a statutory duty, and provide for their enforcement by civil suit instead of by criminal prosecution, as held in *Hepner* v. *United States* [213 U. S. 103, 29 S. Ct. 474, 53 L. Ed. 720, 27 L. R. A. (N. S.) 739, 16 Ann. Cas. 960], nevertheless that doctrine does not warrant the conclusion

that a penalty may be authorized, and its collection committed to an administrative officer without the necessity of resorting to the judicial power. In all cases of penalty or punishment, it is contended, enforcement must depend upon the exertion of judicial power, either by civil or criminal process, since the distinction between judicial and administrative functions cannot be preserved consistently with the recognition of an administrative power to enforce a penalty without resort to judicial authority. But the proposition magnifies the judicial to the detriment of all other departments of the government, disregards many previous adjudications of this court, and ignores practices often manifested and hitherto deemed to be free from any possible constitutional question. * * *

"In *Passavant* v. *United States*, 148 U. S. 214, 13 Sup. Ct. 572, 37 L. Ed. 426, the authority of Congress to delegate to administrative officers final and conclusive authority as to the valuation of imported merchandise, accompanied with the power to impose a penalty for undervaluation, was reiterated, and the doctrine of *Bartlett* v. *Kane* [16 How. 263, 14 L. Ed. 931] was applied. And the same principle was upheld in *Origet* v. *Hedden*, 155 U. S. 228, 15 S. Ct. 92, 39 L. Ed. 130.

"In accord with the settled judicial construction the legislation of Congress from the beginning, not only as to tariff, but as to internal revenue, taxation, and other subjects, has proceeded on the conception that it was within the competency of Congress, when legislating as to matters exclusively within its control, to impose appropriate obligations, and sanction their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power.

"It is insisted that the decisions just stated and the legislative practices referred to are inapposite here, because they all relate to subjects peculiarly within the authority of the legislative department of the government, and which, from the necessity of things, required the concession that administrative officers should have the authority to enforce designated penalties without resort to the courts. But over no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals. If the proposition implies that the right of Congress to enact legislation is to be determined, not by the grant of power made by the Constitution, but by considering the particular emergency which has caused Congress to exert a specified power, then the proposition is obviously without foundation. This is apparent, since the contention then would proceed upon the assumption that it is within the competency of judicial authority to control legislative action as to subjects over which there is complete legislative authority, on the theory that there was no necessity calling for the exertion of legislative

power. As the authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject, it must follow that, if Congress has deemed it necessary to impose particular restrictions on the coming in of aliens, and to sanction such prohibitions by penalties enforceable by administrative authority, it follows that the constitutional right of Congress to enact such legislation is the sole measure by which its validity is to be determined by the courts. The suggestion that, if this view be applied, grave abuses may arise from the mistaken or wrongful exertion by the legislative department of its authority, but intimates that, if the legislative power be permitted its full sway within its constitutional sphere, harm and wrong will follow, and therefore it behooves the judiciary to apply a corrective by exceeding its own authority. But, as pointed out in the passage previously quoted from *Bartlett* v. *Kane*, supra, and as often since emphasized by this court (*McCray* v. *United States*, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561), the proposition but mistakenly assumes that the courts can alone be safely intrusted with power, and that hence it is their duty to unlawfully exercise prerogatives which they have no right to exert, upon the assumption that wrong must be done to prevent wrong being accomplished." Also *McDowell* v. *Heiner, Collector of Internal Revenue* (D. C.) 9 F. (2d) 120.

From what has been said above and from these cases, it is apparent that the power of the tax commission to hear and determine whether there was a violation of the tax law, not in its aspect of a crime, but as part of the administrative procedure of determining whether there attached a penalty as a sanction for the payment of the tax, is within the power of the Legislature to grant and can properly be exercised by the commission. The cases of *Lipke* v. *Lederer*, 259 U. S. 557, 42 S. Ct. 549, 66 L. Ed. 1061, and *Regal Drug Corporation* v. *Wardell*, 260 U. S. 386, 43 S. Ct. 152, 67 L. Ed. 318, are distinguishable. In those cases the Commissioner of Internal Revenue levies the assessment and penalties on liquor which the complainant illegally held or sold contrary to the National Prohibition Act (27 U. S. C. A. § 1 et seq.). Since in no case, whether he paid the correct tax or otherwise, the complainant was allowed to sell or possess for sale, the assessments were in effect nothing more than a punishment or penalty

for the commission of a crime. They could not be otherwise even though called by the act a tax. Where a person is prohibited entirely from doing an act, and its violation denounced as a crime, and a penalty applied if he does it, the penalty is for the commission of a crime and not for the failure to pay a tax or something which in no event he can possess or do. If I am wholly prohibited by law from doing an act and subject to a criminal charge for doing it, the imposition of a penalty for not paying a tax on the right to do such act which in no event have I legally the right to do, is a punishment for a crime. In those cases the court said the collector was undertaking to punish "by fine and penalty for an alleged criminal offense without hearing, information, indictment or trial by jury, contrary to the Federal Constitution." It was a judicial power attempted to be granted to the collector. It must be exercised judicially with a hearing and the proper charging documents and presumably by a court. The distinction between the two types of cases is obvious.

In this case, the Legislature gave the tax commission not only power to hear and determine whether a penalty should attach, but within the limits of from $10 to $299 to fix the penalty. The commission fixed it at $250. This involved not only the function of determining whether a situation was such as would work an imposition of the penalty fixed or ascertainable by law and the function of imposing such penalty, but the function and power of determining the amount of the penalty. This involves not the question of whether the Legislature gave the tax commission a judicial rather than an administrative power (unless we accept the plaintiffs' contention that this power to determine the amount of the penalty is really fixing punishment for a crime), but the question of whether the Legislature could delegate such power to determine the amount, in its discretion, to any tribunal as a matter of penalty imposed not as punishment for a crime but as a sanction to pay the tax. We think it could not do so. Giving to the tax commission the power to determine in its own judgment the

amount of the penalty was a legislative function which could not be delegated. It is not the power to enforce or apply a law, but the power to make a law for each particular case, to determine in its judgment the amount of a penalty. We recognize the power to make reasonable rules and regulations and to make a failure to obey them involve a loss of rights either given by law or by the regulations themselves. But in this case there was no basis provided for the commission to ascertain the amount of the penalty by a mathematical computation, but the broad power to determine its amount within its discretion, from $10 up to $299. It was held in the case of *Board of Harbor Commissioners* v. *Excelsior Redwood Co.*, 88 Cal. 491, 26 P. 375, 22 Am. St. Rep. 321, that this could not be done. The cases cited by defendant, i. e., *United States* v. *Pierre Grimaud*, infra; *United States* v. *Shreveport Grain & Elev. Co.*, 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; *McDowell* v. *Heiner*, supra; *Oceanic Steam Navigation Co.* v. *Stranahan*, supra, were all cases where the penalty was fixed by statute or was made a certain percentage of the tax found to be due. It could not vary with each case regardless of a fixed basis and only as the judgment of the commission dictated. In *Wisconsin Telephone Co.* v. *Public Service Comm.*, 206 Wis. 589, 240 N. W. 411, it was held constitutional to impose upon the utility investigated, the cost of investigation. Here again there was a definite standard fixed by which the amount could be ascertained, to wit, the cost of investigation. Moreover, it was not a penalty. The cases of *Southern Ry. Co.* v. *Melton*, 133 Ga. 277, 65 S. E. 665, and *Zuber* v. *Southern R. Co.*, 9 Ga. App. 539, 71 S. E. 937, were cases where the Railroad Commission of Georgia was empowered to fix a penalty for each day or fraction thereof in which a railroad delayed in furnishing cars at a shipper's request after a certain free time. The commission fixed $1 per day. This was like the power to fix reasonable rates. The exaction was fixed by rule in advance, applicable to all railroads alike and ascertainable by mathematical calculation upon each situation as it arose. It was not a case in which the commission could in

each case set and fix the amount of the penalty in its discretion. The commission could not charge $1 a day in one case and in the next $10 a day and in the next $5 a day demurrage, depending perhaps on its humor. The infirmity in 93-1-5 lies in the fact that the tax commission can in each case name a different sum. It has not set a standard for all cases which fit the rule, but in each case within its mind at its discretion fixes the amount. Only the courts in imposing a fine as a punishment for a crime have this discretion. Moreover, in the Georgia cases, while there was a penalty for failure, the violation was not at the same time a criminal offense.

We are aware that as stated in *United States* v. *Grimaud,* 220 U. S. 506, 31 S. Ct. 480, 483, 55 L. Ed. 563, that "it is difficult to define the line which separates legislative power to make laws, from administrative authority to make regulations," but the matter of deciding rather than mere ascertainment or determination of a penalty which can be made a lien on another's real estate and on which execution may issue, is more than a regulation. A regulation must fit all like situations equally. The commission could not make a different rule for like situations as in its mind at that particular moment appeared to fit the violation. The process of mind employed under this act by the commission involves a discretion and judgment regarding the amount of the penalty. This is exactly the same function which a court would exercise in imposing a fine upon conviction for a crime. The fact that the outside limit is $299, which is the limit for a simple misdemeanor, gives rise to a suspicion that the Legislature had in mind a criminal violation when it gave the commission power, in its discretion, to fix the penalty up to that amount. This suspicion is further confirmed by the use of the word "offense," but these are by no means conclusive factors because in any case it was an offense not to affix the stamps. Either the amount to be fixed is in reality punishment for a crime which implies that the tax commission may hear and determine without a jury the question of whether plaintiffs were guilty of a

crime, or, if considered, merely as a a penalty designed to give sanction for the payment of the tax or the affixing of the stamps, the matter of making it definite or its ascertainment possible by a definite rule (whether the rule itself is made by the Legislature or by the commission by grant of the Legislature) embraces a power which only the Legislature possesses and cannot delegate.

The defendant cites cases where it is held that one who uses an act for the collection of money or for his gain cannot attack that act to escape from its burdens. A study of these cases will show that the person so asserting the unconstitutionality of the act sought to do so to avoid disgorging moneys which he collected under the act for the benefit of others or where he profited by a right which the act gave him which he otherwise would not have had. Thus, where one collects from customers a gasoline tax, he cannot use the defense of unconstitutionality of the act under which he was enabled to collect such tax for the benefit of the taxing unit in order to unjustly enrich himself. *Spencer* v. *Consumers Oil Co., Inc.,* 115 Conn. 554, 162 A. 23; *Wade* v. *State,* 97 Colo. 52, 47 P. (2d) 412. Likewise, where a surety guarantees creditors of his principal under a bond given by requirement of statute, having been paid for the service of the bond, it cannot plead unconstitutionality of the statute when it would never have had occasion or been able to do the business of writing the bond had not the statute required it. Having benefited by the law in a manner which otherwise could not have occurred, it is estopped to deny its constitutionality. *Pyrke* v. *Standard Acc. Ins. Co.* 144 Misc. 53, 258 N. Y. S. 869. In *State* v. *Jutstrom Fish Co., Inc.,* 149 Or. 362, 39 P. (2d) 355, and *United States* v. *Hodson,* 10 Wall. 395, 409, 19 L. Ed. 937, we have cases where both the principal on bond and the surety assailed the constitutionality of the act requiring a bond after they had obtained the privileges the law gave them by virtue of filing the bond. But the suit by the government was on the bond and the only question

was as to the validity of the bond. The court said in the Hodson Case,

"where it [the bond] is voluntarily entered into and the principal enjoys the benefits which it is intended to secure and a breach occurs, it is then too late to raise the question of its validity."

In *Daniels* v. *Tearney*, 102 U. S. 415, 421, 26 L. Ed. 187, it was stated,

"It is well settled as a general proposition, subject to certain exceptions not necessary to be here noted, that where a party has availed himself for his benefit of an unconstitutional law, he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defence, although such unconstitutionality may have been pronounced by a competent judicial tribunal in another suit. In such cases the principle of estoppel applies with full force and conclusive effect."

In all these cases one or more of the following situations were present: (1) The person who assailed the constitutionality had received a benefit which he could not have received had the law not been passed. A bondsman received his premium when he voluntarily went as surety; (2) or some other person, a stranger, who was not in a position to assail the act, did something relying on the conduct of the assailant as legal when the latter acted under the statute. The assailant after having, by acting under the statute, induced the third party to change his position, then seeks to avoid responsibility to such third party on the ground that the statute under which he acted is unconstitutional. This is the case where a producer sends his products to a consignee required to give bond. The bondsman seeks to avoid payment to the producer on the theory that the act requiring a bond is unconstitutional. But the producer sent his produce to the consignee under inducement of the bond. (3) A person obligated or permitted to collect a tax or sum from a third party as in the case of gasoline collects it and seeks to keep the money on the ground that the act requiring or permitting him to collect was unconsti-

tutional. There may be other situations where the court closes the mouth of the person who seeks to open it to declare the statute unconstitutional after having benefited by it or after having acted under it so as to cause others to rely on the validity of his acts. But these cases must have the element of estoppel in them. Certainly, where the state exacted a license for the doing of a business which one could theretofore do without the license, and because such person, compelled to take out a license, sought later to question the constitutionality of some part of the act which penalized him for an alleged violation of it, he could not be said to have lost his right to so assail the act. If so, the state could immunize itself from all attacks on the ground of unconstitutionality by simply requiring a license. It could then say: "You took out the license and benefitted by the act. You cannot now question it." The answer would be:

"The license did not give me the right to do something I never had the right to do before. It was not a benefit to me; it was a burden upon my right to do that business and thitherto not exacted. It was not something I voluntarily took out. I was compelled to take it out. The license or tax itself conferred no benefit on me. I am not trying to evade my responsibilities to a third party who dealt with me to my advantage or reliance upon the act. You are not trying to hold me for taxes which I collected from a third party. I am not even attacking the license features of the act, but the validity of some incidental portion of the act by which you seek to penalize me in a manner which is unconstitutional. I am endeavoring not to protect benefits which I gained by virtue of the act or to unjustly enrich myself by moneys acquired from others by virtue of the act, but from a penalty improperly imposed which by reason of its lien and leviable attributes would work injustice and hardship upon me."

Certainly, a person in such position is not estopped nor has he waived his right to question the constitutionality of such collateral section of the act.

The writ is made permanent and the tax commission is prohibited from further proceeding to collect the pretended penalty. Plaintiffs are awarded their costs.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.