# GENOLA TOWN v. SANTAQUIN CITY et al.

No. 5983. Decided July 6, 1938. (80 P. 2d 930.)

For opinion on rehearing see 96 Utah 104, 85 P. 2d 790.

*Irvine, Skeen & Thurman,* of Salt Lake City, and *George S. Ballif,* of Provo, for appellants.

*Elias Hansen,* of Salt Lake City, and *R. W. McMullin,* of of Payson, for respondent.

WOLFE, Justice.

Appeal from a judgment requiring Santaquin City specifically to perform a contract to deliver from its water system a certain amount of water to Genola Town for culinary purposes. Defendants contend, among other things, that: (1) The agreement was so indefinite and uncertain as not to permit of specific performance; (2) that it lacked mutuality of obligation; (3) that it is in violation of the express provisions of Art. 11, Sec. 6, of the Constitution of Utah. It is also contended that the complaint failed to allege the fulfillment of a condition precedent necessary to bind the plaintiff.

We believe the problems presented will be more clearly understood if the reader has in mind a picture of the water system of Santaquin City which forms the background of the agreement and the controversy growing out of it.

Summit Creek flows northerly down Santaquin Canyon. Santaquin Canyon extends back about twelve miles from Santaquin. Summit Creek is fed from the watersheds of Santaquin Canyon and from springs which arise in the canyon and from "little tributary canyons" running from the main canyon easterly and westerly. Santaquin City takes its water from tunnels which sap the water from certain springs and from the bed of the stream and conducts such water down to its headhouse which is its only reservoir. It also picks up from the bed of the river water to the extent of .28 second feet which belongs to the Summit Creek Irrigation Company, carries this water to a dividing weir where

it spills over and runs back into the creek channel for use by said company. It was testified that during periods of scarcity the Irrigation Company has rented this .28 second feet of culinary water to the City.

We now transfer our attention to the town of Genola. It is a farming community occupying as a town a far larger and less concentrated area than Santaquin. The extreme southern part of Genola is about a mile and a half from the northwestern corner of Santaquin. The citizens of Genola during its entire existence obtained their culinary water from ditches and from wells which were shared by neighbors and by hauling from Santaquin and Payson. Much of its water is somewhat brackish and muddy. The Town of Genola sold $19,500 worth of bonds and with about $13,200 of this money derived from the said sale, and aided by the Public Works Administration and the Works Progress Administration, built a waterworks system. It first intended to build a pipe line to the weir box where the .28 second feet belonging to the Summit Creek Irrigation Company is measured. Negotiations were pending between Genola and the Irrigation Company for this water when the Mayor and one of the Councilmen from Santaquin approached the Trustees of the Town of Genola with the idea of connecting up with the City mains at the northwestern corner of Santaquin and thus save 8,000 feet of parallel line and paying to Santaquin the amount of money such line would cost.

Mr. Glen E. Davis, a Trustee of Genola Town, testified that their Trustees were told by the Councilmen of Santaquin that if Genola gained possession of the .28 second feet belonging to the Irrigation Company, Genola might have as much as or more water than Santaquin during extreme drouth. This was because during drouths Santaquin rented this primary water from the Irrigation Company. They were further told that Santaquin would fight them on any attempt to get that water. In consequence it was agreed between the Town of Genola and the City of Santaquin that the former would pay to the latter $2500, and $30 a year as

part of the maintenance costs of the Santaquin lines, together with sixty shares of stock of the Summit Creek Irrigation and Canal Company, and that Santaquin would deliver to Genola at a point on the line of the former 100 gallons of water per minute so long as the supply in Summit Creek exceeds six second feet, and when it falls below that figure, an amount equal to 1/36 of the flow of Summit Creek. By this means it was intended to prevent a line which Genola would have built to parallel that of Santaquin for about 8,000 feet and instead of getting the .28 second feet from the Irrigation Company to give Santaquin 60 shares of the Irrigation Company stock so that the latter might obtain that .28 second feet, and at the same time Santaquin was to get the $2500 with which it could repair its lines and prevent waste of culinary water. One "fly in the ointment" seems to be the doubt whether the Irrigation Company can be made to deliver to Santaquin, through the 60 shares the latter was to receive, a continuous flow of the .28 second feet. This for the reason that the .28 second feet goes back into the Irrigation Company's ditch and becomes part of its total waters which are rotated among its stockholders. This doubt is reflected in the last paragraph of the agreement which we shall hereafter quote. The contract was executed on August 18th, 1936. Genola started work on September 17, 1936. In the latter part of September, 1936, there was a mass meeting in Santaquin at which objections were made by certain citizens. Many of the citizens of Santaquin were stockholders and users of the irrigation water of the Summit Creek Irrigation Company. There is some evidence that the Irrigation Company has not sufficient water now to serve all its water users. At all events, Summit Creek Irrigation Company advised that they would not deliver any water continuously, but Genola went ahead with the project. It spent $45,000 in construction of the pipe line and reservoir and will be compelled to expend further sums before the waterworks is completed.

On June 11, 1937, Genola tendered Santaquin $2500 and 60 shares of stock in the Summit Creek Irrigation and Canal Company (for which stock it had paid $3050 from the proceeds of the $19,500 bonds sold) and demanded from Santaquin that the water provided for in the contract be turned into the waterworks system of Genola. On June 14th, Genola received a letter stating that the Council of Santaquin refused to accept the water stock and the $2500 and refused to deliver the water specified in the contract. On June 28, 1937, a complaint was filed to compel Santaquin specifically to perform its contract. Santaquin demurred, which was overruled, and such ruling is assigned as error.

The demurrer was on the several grounds, first, that the agreement sought to be enforced was indefinite and uncertain. It is unnecessary to set out the agreement in full. The agreement is not indefinite and uncertain. It states very definitely that the Summit Creek Irrigation Company has a .28 second feet in the Santaquin pipe line system. There is no doubt cast on the present ownership of that water. Moreover, the obligation of Santaquin under the contract to deliver water to Genola does not depend on whether it or the company owns the .28 second feet, nor on whether, if the company owns it, Santaquin acquires ownership of such water, nor whether it may compel the company to give it a continuous flow of that amount. The obligation of Santaquin is not conditional, but absolute. As to whether the agreement is indefinite in that it is doubtful whether it provides for a sale or exchange of water, such will be considered when we take up the main question of the constitutionality of this agreement. It is very definite that water must be delivered by Santaquin to Genola; no indefiniteness as to whether Santaquin or the Irrigation Company must deliver it. We find no indefiniteness regarding whether the agreement contemplates a lease of the waters or waterworks system to the Town of Genola. It is clearly not a lease of the waterworks system. Santaquin is carrying her own water and delivering it to Genola. The $30 per year which Genola

is to contribute toward the maintenance of the Santaquin System is part of the consideration for receiving the water. We must not be caught in the mesh of words or terms. The evidence shows that for this water delivered to Genola, it was willing to pay $2500 in one lump sum and $30 per year to Santaquin, together with the 60 shares of stock in the Irrigation Company. If Genola had built its line to the measuring weir and obtained the .28 second feet from the Irrigation Company, it would have had to spend about $2500 and would have had to maintain that pipe line. It was willing to give 60 shares of stock to Santaquin by which it was hoped to provide Santaquin with a continuous flow from this .28 second feet for the latter's system and provide the latter with $2500 to repair its pipe line and $30 toward annual maintenance. As far as Genola was concerned it would have made little difference if it spent $2500 to build a parallel line to that of Santaquin to procure the Irrigation Company's water or whether it put in Santaquin's possession some means (the stock) whereby that city could obtain that same water and then have Santaquin deliver to Genola from the pipe line of the former approximately the water it would have received had it built to the weir and purchased the water directly from the Irrigation Company. The difficulty Santaquin finds itself in is that the Irrigation Company expressed its refusal to give the City from the .28 second feet a continuous flow to make up what the latter must deliver to Genola. But the contract itself contemplated that there might be this difficulty as we shall see from the last paragraph, quoted hereunder. When the contract is read in the light of the purposes to be accomplished, there is no indefiniteness. Because laymen agree on very definite propositions derived from the actualities of the whole situation which they must deal with, those propositions do not become less definite in actuality because lawyers have difficulty legally labeling the nature of the transaction or in determining the legal aspects of those transactions. It is but natural that each side will choose

to give the transactions that legal aspect which best suits its position.

It is said the contract lacks mutuality of obligation which prevents a court of equity from decreeing specific performance. The argument is that such lack of mutuality arises from the sixth paragraph of the agreement which reads as follows:

"It is understood and agreed between said parties that the Town of Genola is attempting to get a government project to establish its pipe line system and in the event said town does not secure said project and obtain money therefor, then it shall not be liable under this contract."

The contention is that mutuality must be determined as of the date of making the contract which was August 18, 1936; that on said date it was impossible to say whether Genola would be bound; that it lay within the control of Genola to determine whether it would be bound or whether it would bind Santaquin. Such is the case with many contracts whose binding effect depends upon a condition precedent, the carrying out of which condition precedent lies within the power of only one of the parties to the contract. The rule regarding mutuality of obligation as making the contract amenable to specific performance is more honored by exceptions than by obedience to the rule. The doctrine of mutuality has gone through the course of most legal developments. Great legal minds have fashioned the law from the stuff of life by applying a solution which fits the justice of the actual case. A second tier of judges and textbook writers, in order to obtain some uniformity and to adduce principles, have attempted to assemble those holdings found in those cases and derived from the fact situations of actual life, abstract doctrines or principles, in an endeavor to scientificize the law. The third tier of lawyers and judges then attempts to take these abstract principles as forms into which it is attempted to mould other fact situations which are presented to them for solution. The result may be one dis-

cordant with the actualities of life or a necessary exception to the former abstract principle enumerated. Legal principles must spring from fact situations. Fact situations cannot be changed to comport with legal principles. Law must comport with life. The flow of life is largely independent of and extraneous to the law. Life has a habit of outgrowing the habiliments with which the law clothes it. Because the law is born of the activities of mankind, and seeks to govern and direct them for the mutual good of all, it must lag behind the march of events, but not too far. The old doctrine of mutuality of remedy is a concrete example of a rule which has been so eroded by necessary exceptions as to leave it more of a vestige than a substantiality.

Specific performance is granted by equity when it is plain that the party should and can perform and refuses to do so, and injustice not remediable by a money judgment would otherwise result. The nature of the remedy is revealed by the fact that equity takes a hand because the legal remedy in inadequate. The development of the doctrine of mutuality as to remedy reveals that it was founded on the idea that one party should not have from equity what the other party could not have obtained had it applied. The doctrine that at the time of making of the contract there must be mutual fixed obligations is not tenable. If the contract itself provides for a preliminary period definite or indefinite in which it is to be determined whether a condition precedent which will make the contract binding will take place, and before withdrawal by the obligor of the contract, it becomes bilateral by performance of the condition precedent, equity may under the rule above laid down decree specific performance in order to do justice or prevent injustice, as if the contract from the beginning had been bilateral.

The demurrer also touches the point that the complaint, as distinguished from the contract set out in the complaint, does not allege the happening of the condition precedent. It is contended that paragraph 13 of the complaint is not a suf-

ficient allegation in that regard. This paragraph reads as follows:

"Plaintiff alleges that it has fully performed all of the conditions of said contract on its part to be performed, but the defendants have refused and continue to refuse to perform their part of such contract."

We think it sufficient, especially in view of the other fair inferences from the complaint. Paragraph 5 of the complaint states that Genola has partially constructed its waterworks system and has expended $45,000. It is a fair inference from the contract contained in the complaint that the project would not have been constructed without Federal aid. The fact, therefore, that it is constructed also raises a fair inference that the "government project" was secured. These allegations are sufficient under Sec. 104-13-6, R. S. Utah 1933. *A. W. Sewell Co. v. Commercial Casualty Ins. Co.*, 80 Utah 378, 15 P. 2d 327. Moreover, where the evidence shows the condition precedent to have been fulfilled and all parties were aware of that fact and no one was prejudiced, the omission of an allegation that it had been fulfilled would be technical. Modern practice does not countenance reversing a case on such grounds.

It is further argued that specific performance cannot be had because it was contemplated that Santaquin would not be required to deliver water to Genola unless the former obtained a continuous flow from the Summit Creek Irrigation Company. This contention is founded on the last paragraph of the agreement:

"It is further understood and agreed between Santaquin City and the Town of Genola that in the event that the Summit Creek Irrigation and Canal Company shall at any time refuse to allow the City of Santaquin the right to use a continuous flow of water from said Summit Creek into the Santaquin City mains of an amount equal to 1/36 of the flow of said stream, then in that event the Town of Genola agrees to join with the City of Santaquin and pay one-half of the cost, fees and expenses necessarily incurred in the prosecution of a suit in condemnation proceedings or any other legal or equitable right

to a continuous flow into the Santaquin City mains of 1/36 of the flow of Summit Creek."

This alleged uncertainty disappears with the construction which we have given the contract. We construe the agreement to require the City to deliver to the Town at all events water in the amount specified. Whether the 60 shares to be given to the City do or do not entitle it to a continuous flow, whether with or without a lawsuit, the obligation of the City remains fixed and certain, i. e., to deliver to the Town a specified amount of water. In the light of this interpretation we approach the only serious questions presented by this case: That is the question of whether the contract of August 18, 1936, is in violation of Sec. 6, Art. 11, of the Constitution of Utah. This section reads as follows:

"No municipal corporation, shall directly or indirectly, lease, sell, alien or dispose of any water-works, water rights, or sources of water supply now, or hereafter to be owned or controlled by it; but all such water-works, water rights and sources of water supply now owned or hereafter to be acquired by any municipal corporation, shall be preserved, maintained and operated by it for supplying its inhabitants with water at reasonable charges: Provided, That nothing herein contained shall be construed to prevent any such municipal corporation from exchanging water-rights, or sources of water supply, for other water-rights or sources of water supply of equal value, and to be devoted in like manner to the public supply of its inhabitants."

The question is presented in two phases: (1) The complaint shows on its face that it is founded on an invalid agreement. This is on the theory that the provisions of the agreement show either (a) that there was a lease of the waterworks and/or (b) a sale of water rights or sources of water supply, or (c) that in case it is interpreted as an exchange, the provisions show that water rights or water sources of equal value were not exchanged. (2) That if the agreement on its face does not so show, the evidence reveals that it was a sale and not an exchange; but if an exchange that the water rights exchanged were not of equal value.

We have already concluded that the agreement did not include a lease but an obligation to deliver water belonging to Santaquin, the $30 annual payment being part consideration for this obligation. More difficulty arises in determining whether the city is parting with its water rights or water sources. A city may sell its excess water to outsiders. Such is not a sale of its water sources or water rights but water from its system in the manner it sells to its citizens. But may it obligate itself to deliver a definite amount in perpetuity? We think this agreement is in effect a parting with its water right pro tanto. We see no real difference in parting with a water right which yields 100 gallons per minute by transfer and obligating one's self to deliver from a water right 100 gallons per minute in perpetuity. Sec. 6, Art. 11, should not be narrowly or strictly construed. It was meant to secure to communities their water systems and prohibit any sale or lease to private parties. This is one project which the Constitution decreed should be kept in social ownership by the community. Where another town or community needing water would be the beneficiary of a total or partial alienation of water rights or sources, especially where the granting community had an excess supply was perhaps not really intended to be prohibited, yet the language is definite that it shall not be alienated and does not exclude the case where the alienee is another worthy community. We see no escape, therefore, from the proposition that under the agreement the City was in effect parting pro tanto with its water rights.

Was the parting by way of sale or an exchange? Appellant asserts the agreement on its face shows that it was not an exchange, but a sale; that if construed as an exchange the agreement shows on its face that the water rights conveyed in the form of stock ownership in the Irrigation Company by Genola were not equal in value to the water which Santaquin agreed to deliver. The reason why it is claimed this is shown on the face of the complaint is that the $2500 down and $30 annual payment

to be made by Genola themselves show that the water rights were not equal in value because something had to be given by Genola to boot. But we cannot from the face of the complaint presume that the money payments were to make up difference in value. It is agreed that the word "value" in Sec. 6, Art. 11, does not mean equal money value or equal value on the market, but equal use value to the community attaining the waters given in exchange. This being so, there may be other considerations for the payment of money than that of making up a deficiency of use value. The contention that the use value of the water to be exchanged was not equal must therefore be established in the domain of proof since not revealed in the domain of pleading. In consequence it follows that the demurrer was properly overruled.

How stands the case in regard to the evidence in respect to the question of whether the 100 gallons per minute of culinary water were of equal use value to irrigation water represented by 60 shares of stock in the Summit Creek Irrigation and Canal Company? For the purposes of this case we shall assume the worst situation for Santaquin, i. e., that it must take with the other stockholders its water in rotation. The trial judge made no specific finding that the waters were of equal value. It would have been better had he done so. But we think such finding is implied, under finding No. 16. Does such finding of equal use value find support in the evidence? We think it does. There is a dispute in the evidence. We cannot say as a matter of law that the use value of the amount of culinary water Santaquin must continuously deliver to Genola is not offset by a use value of the irrigation water which Santaquin will derive from its stock in the Irrigation Company. The fact that one is obligated to give water in kind and the other obtains for it a certificate which permits it to demand water does not necessarily make the exchange unequal. Stock in a mutual company entails the right to demand such stockholder's aliquot share of the water in proportion as his stock holding bears to all the stock. Water rights are pooled

in a mutual company for convenience of operation and more efficient distribution, and perhaps for more convenient transfer. But the stock certificate is not like the stock certificate in a company operated for profit. It is really a certificate showing an undivided part ownership in a certain water supply. It embraces the right to call for such undivided part according to the method of distribution. Whether one has the right to call for a specific amount of water because of a contract or to call for an undivided part of the whole of a water supply because of a certificate does not make the exchange unequal because one is by contract and the other by certificate. It is asserted that the use value of a continuous flow of 100 gallons per minute of culinary water, or if the stream runs six second feet or less an amount of the same culinary water equivalent to 1/36 of the stream, is not equal in use value. One can be used both for culinary purposes and irrigation purposes while the other (stream water) is unsafe for drinking and can be used only for irrigation purposes. At first blush this seems tenable, but there are other elements involved. Santaquin needs irrigation water. Its 60 shares will at times give it more irrigation water than it gives culinary water in return. Sixty shares give approximately 1/36 of the supply owned by the Irrigation Company. When the stream flows eight second feet, the amounts of water given and received will be equal. After that point Genola will have the better of it because it will get culinary water in a continuous stream, but when the supply in the stream is above eight second feet of water, Santaquin may get much more irrigation water than she gives to Genola in culinary water. When the stream runs 13 second feet, Santaquin gets 162½ gallons of irrigation water per minute for 100 gallons of culinary water delivered per minute. When the stream runs 15 second feet, the City receives 187½ gallons for every 100 gallons delivered. When the flow is eight second feet the sixty shares of stock will yield 100 gallons per minute of irrigation water. When it drops to six second feet or less, Genola gets only

as much culinary water as Santaquin receives irrigation water.

Who can say that under such circumstances the use value may not be equal? It is somewhat like appraising the use value of a cow as compared to a horse on a farm where both are necessary. Unless we hold that the water must be fit for exactly the same use in order to have the same use value, we cannot say that the court was wrong in its finding. We have heretofore held that Salt Lake City might exchange for culinary water some of its irrigation water. This seemingly involves the concept that the water given need not be fit for all the uses of the waters obtained. *State ex rel. Ellerbeck* v. *Salt Lake City*, 29 Utah 361, 81 P. 273.

Other factors may make the trade an equal one. With the $2500 Santaquin may repair its pipe and by so doing save culinary water. In one sense, this water so saved by virtue of Genola's payment may be weighed in the scale with culinary water to be received by Santaquin.

Santaquin signed the agreement of August 18th with its eyes open. It not only agreed with Genola but initiated the negotiations and told Genola that it would contest the latter's buying the .28 second feet from the Irrigation Company. After Genola had secured government aid and had gone ahead on the basis of this trade and abandoned further negotiations with the Irrigation Company, Santaquin, apparently through protest of its citizens who were also stockholders of the Irrigation Company, questioned the validity of the contract. The Mayor of Santaquin stood firm. He still believes the agreement to be beneficial to the City. The other Councilmen changed their minds. While in some cases a party may be estopped from taking advantage of the unconstitutionality of an act (*Tite* v. *State Tax Commission*, 89 Utah 404, 57 P. 2d 734), the representatives of a municipality must act within their powers and the city cannot be estopped from declaring its own acts as unconstitutional. But under the circumstances of this case, we are disinclined to lean toward a construction

of Sec. 6, Art. 11, which would result in avoiding the agreement between this City and Town and thus make for naught a large portion of Genola's expenditures and delay the benefits of them. We see good reasons why equity should exercise its powers to require performance.

The judgment is affirmed and Genola Town is awarded costs.

FOLLAND, C. J., and HANSON, MOFFAT, and LARSON, JJ., concur.