EAST JORDAN IRRIGATION COMPA-
NY, Provo River Water Users' Associa-
tion, and Salt Lake City Corporation,
Plaintiffs and Appellants,

v.

Robert L. MORGAN, State Engineer of
Utah, and Payson City Corporation,
Defendants and Appellees.

No. 920125.

Supreme Court of Utah.

Aug. 5, 1993.

Denise A. Dragoo, Stanford B. Owen, P.
Bruce Badger, Salt Lake City, for East
Jordan Irrigation Co.

Joseph Novak, Marc T. Wangsgard, Salt
Lake City, for Provo River Water Users'
Ass'n.

Ray L. Montgomery, Salt Lake City, for
Salt Lake City Corp.

R. Paul Van Dam, Atty. Gen., Michael M.
Quealy, John H. Mabey, Jr., Asst. Attys.
Gen., Salt Lake City, for Robert L. Morgan.

Steven E. Clyde, D. Brent Rose, Salt
Lake City, for Payson City Corp.

HALL, Chief Justice:

Plaintiff East Jordan Irrigation Company
("East Jordan") appeals from a grant of
summary judgment upholding the state en-
gineer's decision allowing defendant Pay-
son City Corporation ("Payson"), a share-
holder in East Jordan, to change the point
of diversion of a portion of East Jordan's
water without the company's consent. We
reverse.

East Jordan is a nonprofit mutual water
corporation [1] owning legal title to certain

---

1. A mutual water corporation is a nonprofit
corporation formed to supply water only to its
shareholders. 3 Clesson S. Kinney, *Kinney on
the Law of Irrigation and Water Rights,* § 1480,
at 2659 (2d ed. 1912) [hereinafter Kinney]. Wa-
ter is delivered to shareholders in proportion to
the amount of stock owned by each. *Id.* § 1483,
at 2665. Water shortages are shared propor-
tionally by the shareholders, and operating costs
are paid by assessment on the stock. *See gener-*

water rights in Utah Lake and the Jordan River. The corporation diverts water from the river and the lake into a canal and delivers it to its 650 shareholders to be used primarily for irrigation in Salt Lake County. Each of the 10,000 shares entitles the shareholder to receive a pro rata share of the company's water through the canal.

Payson bought 38.5 shares of East Jordan's stock (representing 186.34 acre-feet of water) in 1987. Soon after, it filed an application with the state engineer to change the point of diversion of the water to a city-owned well that draws water from a basin flowing into Utah Lake. Payson sought to use this water for year-round municipal purposes.

East Jordan, Salt Lake City Corporation, and the Provo River Water Users' Association protested the proposed change.[2] They argued, inter alia, that (1) the change application should have been filed by East Jordan as owner of the water right, and (2) the proposed change would impair their vested rights to water in Utah Lake. The state engineer held two informal hearings and approved the change.[3] He concluded that Payson had a vested water right by virtue of its ownership of East Jordan stock and therefore could file a change application in its own name. The engineer considered a number of factors, including the amount of water consumed by irrigation, the amount of water that would be returned to Utah Lake from municipal use, and the seasonal variation in water use. He then ordered that Payson be allowed to divert 144 acre-feet between April 15 and October 31 and 38 acre-feet the rest of the year and that East Jordan reduce the diversion into its canal by 186.34 acre-feet per year. Finally, the order required that Payson install a meter on its diversion well to be available for inspection by East Jordan and that Payson remain liable for assessments and "any other obligations it may incur as a shareholder in the Company."

East Jordan brought this action in the fourth district court, seeking to overturn the engineer's decision. The parties filed cross-motions for summary judgment on a stipulated statement of facts on the issues of (1) whether Payson as a shareholder in the corporation had the legal right to file a change application in its own name without consent of East Jordan, and (2) whether the state engineer had jurisdiction to consider such an application. The trial court denied East Jordan's motion, granted Payson's cross-motion, and subsequently entered judgment in favor of Payson.[4] East Jordan appeals from that judgment.

On appeal, East Jordan argues that the trial court erred in concluding (1) that in the absence of a specific restriction in the articles of incorporation or bylaws, a shareholder in a mutual water corporation has the legal right to file a change application in its own name even where the company opposes the change, and (2) that the state engineer has jurisdiction to approve the application. Its primary argument is that since the corporation is the legal owner of the water rights, only the corporation may

---

ally *Jacobucci v. District Court*, 189 Colo. 380, 541 P.2d 667, 670–72 (1975); Kinney, §§ 1464–89. Such a corporation is distinct from a "carrier ditch company," which exists to furnish water for profit or hire to persons who may or may not be shareholders. We use the terms "mutual water corporation" and "mutual water company" interchangeably.

**2.** Salt Lake City Corporation owns 2,067 shares of stock in East Jordan (20.67%). The Provo River Water Users' Association apparently does not own any stock, but it alleges that it owns rights in the Provo River that depend in part on an exchange for waters stored in Utah Lake. *See generally Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 929–930 (1993). These protestants are also plaintiffs and appellants in

this action, but for simplicity we refer only to East Jordan.

**3.** The engineer issued a decision after the first hearing, in which he approved a diversion of 89.82 acre-feet. Both sides petitioned for reconsideration, and the engineer held another hearing, resulting in the final order discussed in the text.

**4.** East Jordan's complaint also alleged that the proposed change would impair the vested water rights of the company, Salt Lake City Corporation, and the Provo River Water Users' Association. But after the trial court granted Payson's cross-motion, plaintiffs amended the complaint and deleted those allegations so that the court's ruling disposed of all issues in the case.

change the point of diversion. Allowing shareholders to file change applications in their own names ignores the corporate structure and would render these corporations unmanageable.

East Jordan also argues that its articles of incorporation and company policies constitute a "specific restriction" preventing a shareholder from filing a change application without its consent. Moreover, it asserts that the change in fact impairs the vested rights of the company and its other shareholders, and that the state engineer's ruling in effect wrongfully partitions the company's title to its water rights. Finally, East Jordan contends that the state engineer lacks jurisdiction to approve a change application in such a situation because he fulfills an administrative function and lacks the authority and training to adjudicate the legal rights of the parties.

Payson responds that mutual water companies are fundamentally different from other types of corporations, that shareholders in such corporations have direct interests in the water rights held by the corporation, and that among these rights is the right to change the place of diversion. Payson contends that while East Jordan may have legal title to the water rights, the shareholders have equitable title. Payson also disputes East Jordan's other claims.

■ We first state the standard of review. This matter arose in the district court under Utah Code Ann. §§ 73–3–14 (1989) and 63–46b–15 (1989) as a de novo review of the state engineer's decisions approving Payson's change application. In determining whether the district court properly granted summary judgment as a matter of law, this court gives no deference to the trial court's legal conclusions and reviews those conclusions for correctness.[5]

■ We first address the issue of whether Payson has the legal right to file a change application in its own name without the consent of East Jordan. We conclude that Payson, as a shareholder in a mutual water corporation, has no such right. We base this decision on the statutory scheme

governing the appropriation of public waters, the principles of corporate law bearing on the function and power of boards of directors to manage corporate affairs in the interest of shareholders as a whole, and the dictates of sound public policy.

The right to change a point of diversion, place, or purpose of water is governed by Utah Code Ann. § 73–3–3(2) (1989), which provides:

(a) Any person entitled to the use of water may make:

(i) permanent or temporary changes in the place of diversion;

(ii) permanent or temporary changes in the place of use; and

(iii) permanent or temporary changes in the purpose of use for which the water was originally appropriated.

(b) No change may be made if it impairs any vested right without just compensation.

This case ultimately turns on whether a shareholder in a mutual water corporation is "a person entitled to the use of water" under the statute. Payson narrowly focuses on the language of this section to support its position that it has the right to change its point of diversion over East Jordan's objection. However, section 73–3–3(2)(a) must be read in light of the entire statutory scheme. Payson fails to consider whether it is "entitled to the use of water" in the same manner proposed by a change application.

Utah Code Ann. § 73–3–1 directs how one becomes legally "entitled" to the use of water:

Rights to the use of unappropriated waters of this state may be acquired only as provided in this title. *No appropriation of water may be made and no rights to the use thereof* initiated and no notice of intent to appropriate *shall be recognized except application for such appropriation first be made to the state*

5. *Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989) (per curiam).

*engineer* in the manner hereinafter provided, and not otherwise.

(Emphasis added.)

Rights to the use of water may be obtained by two methods under Utah's appropriation scheme. The first is commonly known as a diligence claim. Prior to 1903, the law allowed a person to appropriate public water by merely turning or diverting water from its natural channel and putting it to beneficial use.[6] This method of appropriation has been preserved by statute. Utah Code Ann. § 73-5-13 recognizes diligence rights to the use of water not represented by a certificate of appropriation issued by the state engineer.

As of March 12, 1903,[7] the waters of this state were recognized to be the property of the public, and a procedure was formalized for the acquisition of rights to the use thereof in Utah Code Ann. § 73-3-1. Under this method of appropriation, Utah Code Ann. § 73-3-2 requires any person seeking to appropriate water to do so by written application to the state engineer. The application must set forth the name of the person, corporation, or association making the application, the nature of the proposed use, the quantity thereof, and the source from which the water is to be diverted, together with all other pertinent information. Additionally, Utah Code Ann. § 73-3-3(5)(a) provides that a change in point of diversion, place, or use can be accomplished only upon application and approval of the state engineer following the same procedures governing applications to appropriate water.

Payson has not filed an application to become an appropriator of public waters. To the contrary, title to company water rights was judicially confirmed in East Jordan under the Morse and Booth Decrees.[8] Payson's ownership of shares in East Jordan does not afford it a right conferred by the state to "the use of water" as contemplated by section 73-3-3(2). It necessarily follows that any change in point of diversion can be initiated only by East Jordan itself since it alone owns the right as an appropriator to the use of public waters.[9] Therefore, Payson does not have standing before the state engineer to seek a change in the point of diversion.

■ Payson claims to be an "equitable owner" of its shares of East Jordan's water rights. However, its equitable ownership remains subject to the general rule governing corporations that directors, rather than shareholders, control the affairs of the corporation. East Jordan was organized under the territorial laws in 1878 and currently is governed by the Utah Nonprofit Corporation and Co-operative Association Act.[10] Section 16-6-34 provides that "the affairs of a nonprofit corporation shall be managed by a governing board."[11] Article VII of East Jordan's articles of incorporation[12] provides, "The Board of Directors shall have the general supervision, management, direction & control of all the business and affairs of the company, of whatever

---

**6.** *Bishop v. Duck Creek Irr. Co.*, 121 Utah 290, 293, 241 P.2d 162, 164 (1952).

**7.** *See* 1903 Utah Laws ch. 100, § 47.

**8.** *See Salt Lake City v. James A. Gardner*, Fourth District Court, Utah County, June 5, 1909 ("Booth Decree"); *Salt Lake City v. Salt Lake City Water & Elec. Power Co.*, Third District Court, Salt Lake County, Civil Nos. 2861, 3449, 3459, July 15, 1901 ("Morse Decree").

**9.** We also note that water rights are transferred by deed in substantially the same manner as real estate. In contrast, a shareholder's interest in a water company is personal property and is transferred as such. Utah Code Ann. § 73-1-10 (1989).

**10.** Utah Code Ann. §§ 16-6-18 to -112. Section 16-6-20(1)(c) provides that the act applies to

"mutual irrigation, canal, ditch, reservoir and water companies and water users' associations organized and existing under the laws of this state on the effective date of this act."

**11.** *See Anderson v. Grantsville N. Willow Irr. Co.*, 51 Utah 137, 141-42, 169 P. 168, 169 (1917) (noting that where stockholders directed president of mutual water corporation to issue certain stock but directors refused to approve it, issuance of stock was void).

**12.** Although we refer to the "articles of incorporation," we note that the documents submitted by the parties bear the label "Articles of Association." Because the documents are indeed articles of incorporation, we refer to them as such.

kind." A change in point of diversion certainly implicates management of the water supply as a whole. It necessarily follows that any change in the point of diversion of water from a source other than East Jordan's canal can be initiated only by East Jordan itself since it alone is empowered with the right to manage and control the affairs of the company.

.What Payson did gain by its purchase of East Jordan shares is the right to receive a proportionate share of the water distributed by East Jordan out of its system in the same manner as all other shareholders.[13] East Jordan's articles of incorporation, as amended, set forth the objective, powers, and purposes of the water company. Article III thereof reads in pertinent part:

> The pursuit or business of this association is, and shall be the construction, operation and maintenance of a canal—said canal to extend from a point in the Jordan River ... to ... Salt Lake city, ... the purpose of said canal being to direct a portion of the waters of the said Jordan River, *to be appropriated, used, and disposed of, sold and distributed by said association,* for agricultural, manufacturing, domestic or ornamental purposes ... and to do and perform such work and acts, and use such mechanical or other means and appliances as may be necessary to maintain or increase the flow of water in the said Jordan River.

Payson's rights as a shareholder and its relationship with East Jordan are dependent on and limited by the scope of East Jordan's articles of incorporation, which Payson agreed to by virtue of its purchase of shares. Here, Payson is seeking a point of diversion, place of use, and nature of use that are substantially different from those of the .other shareholders and those anticipated in East Jordan's articles of incorpo-

ration. Payson purports to divert its share of the water before it enters East Jordan's delivery system, to transport the water outside of East Jordan's service, and to use it for municipal purposes.

The agreement between East Jordan and its shareholders imposes the duty on the association to manage its affairs in the interest of its shareholders as a whole.[14] That duty is not to be infringed upon by the state engineer. Rather, any dispute that should arise out of the agreement is to be resolved by a court of competent jurisdiction. Under these circumstances, East Jordan clearly has an interest in reviewing the application to determine whether it is in the best interests of the company and its shareholders.

Three other states have addressed this issue. Payson argues that we should follow the Colorado rule set forth in *Wadsworth Ditch Co. v. Brown.*[15] The court in *Wadsworth* essentially held that a shareholder has the right to change a point of diversion over the objection of the company. *Wadsworth* involved a shareholder who could no longer beneficially use his water at the original diversion point and therefore petitioned the water court to change the diversion point. The trial court approved the change provided that Brown's stock remained liable for assessment to maintain the company ditch. The Colorado Supreme Court concluded that the right to change the diversion point was a property right belonging to the stockholder in a mutual ditch company.[16]

Unlike Utah law, under the Colorado appropriation scheme, the change process is commenced in a court of competent jurisdiction rather than with an application to an administrative agency.[17] A court is better suited to construe a company's articles of incorporation and bylaws than the state

13. *See Park v. Alta Ditch & Canal Co.,* 23 Utah 2d 86, 90, 458 P.2d 625, 627 (1969).

14. *See Summit Range & Livestock Co. v. Rees,* 1 Utah 2d 195, 197, 265 P.2d 381, 382 (1953).

15. 39 Colo. 57, 88 P. 1060 (Colo.1907).

16. *Id.* at 1061. We note that Idaho followed Colorado for some time but changed its position

by statute in 1943 to provide explicitly what the Utah statute provides for implicitly, namely, that a shareholder may not change its point of diversion without the consent of the corporation.

17. *See* Colo.Rev.Stat. §§ 37–92–201 to –307.

engineer, who merely performs an administrative function. Therefore, the *Wadsworth* case is inapposite.

Further, we are more persuaded by California authority that has established through case law what Utah has established by statute. In *Consolidated People's Ditch Co. v. Foothill Ditch Co.*,[18] the California court held that a shareholder does not have the right to change its point of diversion over the objection of the company. In *Consolidated People's Ditch Co.*, the defendant bought stock in a number of different mutual water corporations along a river and started to enlarge a canal upstream to divert the water represented by this stock. The trial court enjoined construction of the canal, and the supreme court affirmed. The court noted that shareholders in mutual water corporations are entitled to proportionate distribution of the water of the corporation, but no more:

> Such stockholders are in that sense and to that extent, *but to none other*, owners of the water and water rights which the corporation possesses, and over the distribution of which it exercises under general laws and under its particular by-laws full and exclusive control.[19]

The court also noted that the term "mutual water company" had no legal meaning that would differentiate such companies from other corporations administering property for the benefit of their stockholders.[20] The court stated that "it would seem to be too clear for argument that neither one nor any number of such stockholders would or could possess the legal right to take or to receive the amount of water to which [they] may be entitled by another manner or means than those supplied by the corporation itself."[21] To recognize such a right

> would necessarily be to admit the possession of similar rights in each and every stockholder in each of said corporations to go and do likewise, and it is too plain

for argument that such an admission would result in a state of inextricable discord and confusion among the owners of water rights of various sorts [all over California]. The creation or threatened danger of such a consequence would of itself supply a sufficient reason for the use of the injunctive processes of the court in the way of its prevention.[22]

Payson argues that California water law is a "mixed bag" of appropriative and riparian concepts and that Utah has always followed the "Colorado doctrine" of appropriation. Both of these arguments may be correct, but they are irrelevant. The cases supporting both the Colorado and the California positions are completely unrelated to whether the underlying water rights were appropriative or riparian.

More important, we are persuaded by the reasoning of the California court in *Consolidated People's Ditch Co.* that allowing the shareholder this right would ultimately lead to "a state of inextricable discord and confusion among the owners of water rights."[23] This would certainly apply in this situation, where East Jordan has 650 shareholders. We fear the havoc that would invariably ensue if every shareholder in the corporation were to attempt to govern the corporate affairs as they relate to the appropriation of waters. Indeed, water companies could well be destroyed by complete changes of use of water. In addition, some rivers in Utah, for example, the Sevier River, are extremely long. It would be impossible to manage the appropriation if each individual water user were allowed to take water from anywhere along the river.

It should be observed that our ruling today does not leave the shareholder without a remedy. The rights that Payson or any other shareholder has to the use of water and the points of service within East Jordan's system can be readily determined

18. 205 Cal. 54, 269 P. 915 (1928).

19. *Id.* 269 P. at 920 (emphasis added).

20. *Id.*

21. *Id.*

22. *Id.* at 921.

23. *Id.*

by seeking appropriate relief in the court system. Payson's proper course of action in this matter was to bring its request for change application to the East Jordan board of directors. In the event that its request for change was unreasonably refused after consideration by the board, the shareholder could have sought judicial relief wherein Payson's arguments concerning the appropriateness of board policy regarding change applications and the regulation of the shareholder's rights could have been fully explored.[24]

We need not reach East Jordan's contention that the state engineer lacked jurisdiction to approve a shareholder's change application because we hold that the shareholder in a mutual water corporation does not have standing to change its point of diversion absent the consent of the corporation. We reverse.

HOWE, Associate C.J., and ZIMMERMAN, J., concur.

STEWART, Justice, concurs in the result.

DURHAM, Justice, dissenting:

I respectfully dissent. The majority holds that a shareholder in a mutual water corporation does not have the right to change his or her point of diversion because the water rights are owned by the company rather than the shareholder. In so holding, the majority makes a number of crucial errors. First, the majority improperly treats water like an ordinary corporate asset and assumes that mutual water companies are the same as other corporations. The majority further ignores long-established Utah case law holding that mutual water corporations may not interfere with

a shareholder's use of his or her share of water unless the shareholder's use harms the corporation or other shareholders. Finally, the holding is bad policy; it assumes without adequate analysis that allowing shareholders to change their points of diversion would destroy water corporations, and it ignores the need for flexibility and transferability of water rights.

The main opinion reasons that East Jordan, as the true "owner" of the water rights, has the sole right to change the point of diversion. This position ignores the fact that we have previously established that shareholders in mutual water companies do in fact have ownership interests in the water rights.

For example, in *Genola Town v. Santaquin City*, 96 Utah 88, 80 P.2d 930 (1938), two municipalities entered into a complex exchange agreement wherein Santaquin agreed to deliver culinary water to Genola in exchange for cash and shares of stock in a mutual water corporation, which stock entitled the holder to delivery of irrigation-quality water. The citizens of Santaquin protested, and the city refused to perform. Genola sued for specific performance, and the trial court found for the plaintiff.

This court affirmed. Santaquin raised a number of objections, but the only "serious question"[1] presented was whether exchanging water in kind for shares in a mutual water company violated article XI, section 6 of the Utah Constitution, which forbids a municipality from alienating its water rights unless it receives in exchange water rights "of equal value." Utah Const. art. XI, § 6.[2] We held that water company stock could be of equal value to direct water rights, because stock in a mu-

---

**24.** *See Syrett v. Tropic & E. Fork Irr. Co.*, 97 Utah 56, 89 P.2d 474 (1939); *Baird v. Upper Canal Irr. Co.*, 70 Utah 57, 257 P. 1060 (1927).

**1.** 80 P.2d at 935.

**2.** This section provides in full:
No municipal corporation, shall directly or indirectly, lease, sell, alien or dispose of any waterworks, water rights, or sources of water supply now, or hereafter to be owned or controlled by it; but all such waterworks, water rights and sources of water supply now

owned or hereafter to be acquired by any municipal corporation, shall be preserved, maintained and operated by it for supplying its inhabitants with water at reasonable charges: Provided, That nothing herein contained shall be construed to prevent any such municipal corporation from exchanging water-rights, or sources of water supply, for other water-rights or sources of water supply of equal value, and to be devoted in like manner to the public supply of its inhabitants.

tual water company is essentially the same as ownership of water rights themselves:

> Water rights are pooled in a mutual company for convenience of operation and more efficient distribution, and perhaps for more convenient transfer. *But the stock certificate is not like the stock certificate in a company operated for profit. It is really a certificate showing an undivided part ownership in a certain water supply.*

80 P.2d at 936 (emphasis added); [3] *see also Smithfield West Bench Irr. Co. v. Union Central Life Ins. Co.*, 105 Utah 468, 142 P.2d 866, 869 (1943) (*"The shareholders are in effect owners in common of the waters* with certain limitations as between one another governing the use thereof." (emphasis added)).

We reiterated the principle that shareholders in a mutual water corporation actually own water rights in *St. George City v. Kirkland*, 17 Utah 2d 292, 409 P.2d 970 (Utah 1966). In *Kirkland*, a mutual water company's charter lapsed in 1953 after fifty years of existence, and the company did not reincorporate until four years later. After reincorporation, a number of people filed claims to the company's water, arguing that the corporation forfeited its water rights when it ceased to exist. This court rejected these claims, holding that the shareholders continued to own the water rights "although the agency charged to administer and deliver the water to those entitled, was as dead as a mackerel." *Id.* 409 P:2d at 971. The court held that the corporation was *not* the owner of the water rights—it simply provided a method for the shareholders to distribute the water among themselves. We upheld the trial court's conclusion that the corporation

> *"merely provided another vehicle for such ownership (stockholders') and use of such water"* consequently that such ownership continued after 1953, and could not be attacked if the same beneficial use continued, whether by individual shareholder, whether by agreement of shareholders among themselves, whether

administered by an agent, partnership or anything else.

*Id.* 409 P.2d at 971 (emphasis added).

The majority concludes that East Jordan is the sole owner of the water rights because it is named in the decree. However, ownership of water is far more complex than ownership of other forms of property, and the mere existence of legal title does not determine all the rights of ownership. Indeed, even the term "ownership" is an oversimplification. A number of different rights are subsumed under this concept, but here we are concerned with only one: the right to control the point at which the water is taken. Due to the unique nature of both water and the mutual water corporation, a shareholder has at least some ownership interest in the water rights held in the corporation's name, and based on Utah case law dealing with similar issues, part of this interest includes the right to change the point of diversion.

Water is a unique commodity in a desert state such as Utah; society could not survive here on a large scale if people did not capture, divert, and use the small amount of water that is present. Thus, while a water right is considered a "property right," certain legal principles regarding water have developed in the West that differ significantly from the rules regarding other forms of property. First, the law does not allow a private person to really "own" water. All waters in the state belong to the public, Utah Code Ann. § 73–1–1, and one may obtain only the right to *use* water. *Melville v. Salt Lake County*, 570 P.2d 687, 688 (Utah 1977); *see Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 933 n. 8 (July 27, 1993). Second, as opposed to any other form of private property, one has the right to use water only to the extent that he or she puts it to "beneficial use." *Melville*, 570 P.2d at 688; Utah Code Ann. § 73–1–3 ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."). Third, in accordance with the beneficial use principle, one forfeits his or her

---

**3.** This passage is repeated verbatim in *St. George City v. Kirkland*, 17 Utah 2d 292, 409 P.2d 970, 972 (1966), and *Swasey v. Rocky Point Ditch Co.*, 617 P.2d 375, 379 (Utah 1980).

rights to water after failing to use it for five years. Utah Code Ann. § 73–1–4.

These differences between water and other forms of property are crucial in determining the respective rights of shareholders and mutual water corporations. For example, while the water rights may be held in the corporation's name, *only the shareholder has the right to use the water.* The shareholder, not the corporation, decides whether to use his or her water on certain crops, for domestic use, or for some other purpose. Further, the shareholder decides *where* he or she will use this water. The mutual water corporation is under a perpetual duty to deliver water to the shareholder, 3 Clesson S. Kinney, *Kinney on Irrigation and Water Rights* § 1486 (2d ed. 1912) [hereinafter Kinney] (citing *Miller v. Imperial Water Co.*, 156 Cal. 27, 103 P. 227, 229 (1909)); it may not decide that it would rather deliver the water to someone else or for some other purpose. If it fails to deliver the proper share of water to the shareholder, the shareholder has a remedy in mandamus, *Baird v. Upper Canal Irr. Co.*, 257 P. 1060, 1064–65 (Utah 1927); *Miller*, 103 P. at 229, or in damages, *Swasey v. Rocky Point Ditch Co.*, 617 P.2d 375, 379 (Utah 1980). Moreover, a mutual water company cannot maintain its water rights unless its shareholders use the water. Since one does not have a legal right to the use of water unless and until someone puts it to beneficial use, "[i]t therefore follows that, where the company is not itself the consumer, but simply furnishes and distributes the water to others, in order to perfect the appropriation, it takes the joint action of both the corporation and the consumers." Kinney, § 1475, at 2650. Thus, in *Kirkland*, the *shareholders* owned the water rights: "The question is whether [the shareholders] beneficially used the water during the 50 year period...." 409 P.2d at 971.

Ownership of water rights is thus not as straightforward as the majority opinion implies. The shareholder is an essential part of the ownership equation, for he or she is the one who actually puts the water to beneficial use. Indeed, as East Jordan con-cedes, if the shareholder fails to use his or her share of water, the *corporation* may lose its rights. Contrary to the majority's conclusion, the name on the decree therefore does not necessarily determine who "owns" the water rights.

In holding that water rights are company property and that only the board of directors has control over the point or points of diversion, the majority also ignores critical differences between mutual water companies and other corporations. The most striking difference is that mutual water corporations exist solely to serve their shareholders. While it may be technically true that the typical business corporation also exists for the benefit of its shareholders, it is more accurate to say that the business corporation operates to make a profit for *itself* that the shareholders then receive as dividends. A mutual water company, on the other hand, exists to serve its shareholders *directly*. The shareholders do not benefit from the company's balance sheet; rather, they benefit because they receive water.

This court historically has recognized the unique nature of mutual water corporations when considering the rights of their shareholders. The cases discussed above treat the mutual water corporation as merely a device to manage delivery and distribution of water rather than as the owner of water. It has often been said that even where a mutual water corporation owns legal title to water rights, the shareholders own "equitable title." *See, e.g.*, Kinney, §§ 1475, 1481. This court has stated that a mutual water company "*is simply a trustee for the stockholders, and not the owner of the water.*" *Center Creek Water & Irr. Co. v. Lindsay*, 21 Utah 192, 60 P. 559, 560 (1900) (emphasis added); *see also Smithfield West Bench Irr. Co.*, 142 P.2d at 869 ("The waters of a mutual irrigation company belong to the users, *the company being merely a distributing and apportioning trustee.*" (emphasis added)). Water is therefore not simply a corporate asset over which the board of directors automatically has exclusive control.

The majority opinion also fails to acknowledge case law that has developed regarding the relative rights of mutual water companies and their shareholders. While this court has never faced the precise issue of whether a shareholder may change his or her point of diversion without company consent, we have considered the relationship in a number of other contexts. These cases establish that a shareholder in a mutual water corporation has a right to do whatever he or she wants with his or her share of the water, and the company may not interfere with this right. Further, the shareholder has the exclusive right to determine where and how the water will be used.

In *Baird v. Upper Canal Irrigation Co.*, 70 Utah 57, 257 P. 1060 (1927), the plaintiff shareholder brought an action in mandamus to compel the defendant mutual water corporation to connect her pipeline to the company's main line at a certain point. The plaintiff was already receiving her share of company water through three other connections, but she sought a new connection so that she could supply twelve or thirteen other houses with water. The trial court found for the plaintiff and ordered the company to make the connection as long as the plaintiff paid the expenses of doing so.

This court affirmed. On appeal, the company argued, among other things, that it could not be compelled to connect the shareholder's pipe because doing so would violate a company regulation that prohibited any future connections that would divert culinary water outside the company's service area. The court rejected this argument:

> Nor do we see upon what theory the stockholders of the defendant company claim the right to limit the use of the culinary and domestic water to the homes and premises within the area irrigated by water controlled and regulated by the defendant company. *When a stockholder has the water to which he is entitled delivered into his private pipe line, it becomes his personal property. One of the incidents of the ownership of property is the right to use, lease, or otherwise dispose of the same as the owner may desire so long as the rights of others are not interfered with.* In this case it is difficult to see how the rights of the other stockholders would be affected by the mere fact that the water flows out of a private pipe line beyond the limits of the land irrigated by water controlled by the defendant company rather than within such boundary lines. *A regulation made solely upon such a basis is an unwarranted interference with the rights of stockholders not consenting thereto.*

*Id.* 257 P. at 1065 (emphasis added).

*Baird* established that water becomes the shareholder's property once it is delivered to him or her and that the shareholder has the right to use it as he or she wishes as long as it does not interfere with the rights of others. But *Baird* is compelling for three additional reasons. First, East Jordan complains that Payson's proposed change would result in the removal of water from East Jordan's service area and would change from irrigation to municipal use. As *Baird* demonstrates, these are not valid concerns of the corporation.[4] Second, *Baird* implies that a shareholder would not need the company's permission to file an application for a change in *place* or *purpose* of use, and these changes are governed by the same statute that covers changes in points of diversion. Utah Code Ann. § 73–3–3(2)(a)(ii), (iii). In other words, the phrase "person entitled to the use of water" probably would include a shareholder for purposes of subparagraphs (ii) and (iii). This interpretation should also apply to changes in the point of diversion governed by subparagraph (i). *Id.* § 73–3–3(2)(a)(i).

Third, and most important, *Baird* suggests a practical reason to allow a shareholder to change his or her point of diver-

---

**4.** Further, East Jordan's articles of incorporation expressly allow the company to appropriate, use, or distribute water for "agricultural[,] manufacturing, domestic or ornamental purposes."

sion over the company's objection. Under its reasoning, East Jordan could not object if Payson took its share of water through the company's canal and then somehow delivered it up to the city through its own facilities (e.g., by pumping the water through an aqueduct).[5] And since Payson has the right to take its water wherever it wants after the water enters its own pipes and ditches, it should also be allowed to take the water from further up the natural watercourse. Given that Payson can use its water for municipal purposes anyway, it is illogical to force Payson to pump the water at great expense when it could just as easily take the same amount of water from a point upstream.

This court has also established that a shareholder may take his or her water from anywhere along the company canal he or she chooses, as long as he or she does not increase costs or otherwise negatively affect the corporation. This principle was not made explicit in *Baird,* but it is a necessary predicate for the court's holding that the corporation had to connect the shareholder to the pipeline at a point of *her* choosing. A similar mandamus case is *Syrett v. Tropic & East Fork Irrigation Co.,* 101 Utah 568, 125 P.2d 955 (1942). In *Syrett,* the plaintiff shareholder owned land on the plateau above Tropic Valley near Bryce Canyon. He sought an order compelling the corporation to deliver water to these lands, and the trial court found for the plaintiff. This court affirmed, rejecting the corporation's argument that its articles of incorporation did not authorize it to deliver water on the plateau. The court also noted that "since under [the articles] the water is to be divided to each person, without specifying where he is to receive it, it would appear that a stockholder should be entitled to receive his proportionate amount of water at any reasonable point along the canal system." *Id.* at 957.

Another similar case is *Moyle v. Salt Lake City,* 50 Utah 357, 167 P. 660 (1917). In *Moyle,* the plaintiff entered into a contract with Salt Lake City in which she exchanged her rights to culinary water from Parley's Canyon Creek for nonpotable water from Utah Lake to be delivered through a canal from the Jordan River for irrigation. The agreement was silent as to the place of delivery, but for over twenty-five years, the city delivered the plaintiff's water to her land just below Parley's Canyon. The city annexed these lands, and they ceased to be used for farming. The plaintiff had other land below the city's canal about five miles south of her Parley's Canyon land (closer to the head of the canal), and she sought to have the water delivered to that land. The trial court ordered the change, finding that the city's costs of delivering the water would not increase.

We affirmed, noting that while the water had always been delivered to the plaintiff's Parley's Canyon lands, nothing in the contract required that the water be delivered there. In making this determination, the court discussed the unique nature and importance of water in a desert state such as Utah. *Id.* 167 P. at 662. The court also noted that a contract purchaser of water should have the same right to change his or her point of delivery as a direct appropriator:

Assuming the city's canal to be a natural stream, and that the plaintiff had appropriated and was entitled to divert the quantity of water found by the court from such stream, no one would doubt her right to change the place of diversion to some other point on the stream, so long as she, in making the change, did not interfere with the rights of any one else. The city concedes that the plaintiff is entitled to a certain quantity of water flowing in its canal, and that she has received it and it has been delivered to her at a particular place. Now, why may she not change the point or place of delivery precisely upon the same conditions and upon the same theory that she may change the point or place of diversion on the stream, provided she does so without increasing or adding to the expense of the city in delivering the water

---

5. This will be discussed in greater detail below.

to her? Is not the right to change the place of diversion under the law based upon the fact that conditions change, and that it may be that the original point of diversion selected by the appropriator no longer responds to his needs, and that to continue the old place of diversion may result in waste?

*Id.* The court stressed, however, that it was not deciding what the result would be if the contract had in fact specified a place of delivery. *Id.* at 663.

*Moyle* dealt with an exchange contract rather than with a shareholder in a mutual water corporation, but its reasoning applies to this dispute as well. As noted above, a corporation has a duty to deliver water to its shareholders, a duty contractual in nature. Similarly, while East Jordan points out that shareholders have always taken their water through the company's dam and canal, it has not cited any provision in its articles of incorporation, bylaws, or other regulations that *requires* a shareholder to do so. Further, *Moyle* recognizes that water has special status in this arid region, that conditions and needs change, and that a water user should be able to change his or her use to reflect changed conditions. *Id.* at 662–63.

These cases establish that a shareholder's interest in the water of a mutual company includes the right to decide where he or she will receive the water and where and how the water will be used, as long as a proposed change does not increase the company's costs or otherwise interfere with its ability to manage the water supply for the benefit of all shareholders.[6] The point at which a shareholder receives company water is thus not simply a corporate affair. *Baird, Syrett,* and *Moyle* each involved a change of diversion points *within* a company canal, but a change from a canal to a natural watercourse should be subject to the same rule. A shareholder in a mutual water corporation, like any other water user, should be able to adapt his or her use of water in response to changing economic and social conditions, since otherwise he or she will lose the water right.

A shareholder's rights are not unlimited, of course. This court has decided several shareholder-company disputes in favor of the corporations, but only where the shareholder's claim would have increased the company's costs or interfered with the management and distribution of the water supply. For example, we have held that a mutual water corporation is not required to extend a company ditch to reach a shareholder's lands. *Swasey v. Rocky Point Ditch Co.,* 617 P.2d 375 (Utah 1980). Similarly, a shareholder may not compel the corporation to install devices to measure the amount of water each shareholder receives, at least where the shareholder fails to demonstrate that he or she has been receiving less than his or her fair share of water. *Id.* at 379; *Yardley v. Long Canal Co.,* 111 Utah 247, 177 P.2d 530 (1947). However, should the company decide to install such devices, it may compel all shareholders to pay the cost. *Big Cottonwood Tanner Ditch Co. v. Kay,* 108 Utah 110, 157 P.2d 795, 799 (1945).

East Jordan relies on *Park v. Alta Ditch & Canal Co.,* 23 Utah 2d 86, 458 P.2d 625 (1969), for the proposition that the company's duty is to protect all shareholders from the whims of an individual shareholder. Under its reasoning, the company must give its approval to any change. However, *Park* is easily distinguishable. In *Park,* the company had entered into an agreement in which it traded its rights to water from Alta Spring for a greater quantity of water from Deer Creek Reservoir plus cash. A shareholder sued to stop the deal, arguing that he had an absolute right to the particular water of Alta Spring and that the corporation had no authority to

---

6. East Jordan's articles of incorporation do not expressly prevent a shareholder from making such a change without company consent. I do not address whether or by what means a mutual water company may restrict a shareholder's right to change his or her point of diversion, though I note that Colorado allows a corporation to do this in the articles of incorporation, bylaws, or other written restriction. *See, e.g., Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d 501, 506–09 (Colo.1982) (upholding bylaw imposing "reasonable limitations" upon shareholder's right to change point of diversion).

divest him of that right. The court disagreed, finding that the contracts at issue did not amount to a conveyance of the plaintiff's water: "The agreements in question here are not in essence a conveying away of water; nor do they deprive plaintiff of his water." 458 P.2d at 627.

The issue in *Park* was whether the exchange of water divested the plaintiff of his rights. The court held that it did not, since the Alta Spring water would be replaced by water from Deer Creek Reservoir. Under the agreement in *Park*, the plaintiff apparently would have received the same amount and quality of water at the same place as he had previously received it—the only difference would be the source. *Id.* If the court had found for the plaintiff, it would effectively have given each shareholder veto power over any exchange agreement, even where the exchange would not harm the shareholder in any way. This would have interfered with the corporation's ability to manage the water supply as a whole.

*Park* and these other cases do not preclude a shareholder from changing his or her point of diversion, because *such a change does not interfere with the company's ability to manage its water supply.* The majority asserts that mutual water corporations cannot manage their affairs if shareholders are allowed to make these changes but fails to specify how this is so. Instead, like the California Supreme Court sixty-five years ago, the majority simply assumes that affirming the engineer's order would be the downfall of such corporations. *See Consolidated People's Ditch Co. v. Foothill Ditch Co.*, 205 Cal. 54, 269 P. 915, 921 (1928) (asserting without analysis that "it is too plain for argument" that allowing shareholder changes would lead to "inextricable discord and confusion"). As the majority acknowledges, however,

shareholders in Colorado have been able to make changes in their points of diversion since at least 1907, *Wadsworth Ditch Co. v. Brown*, 39 Colo. 57, 88 P. 1060 (1907), and nothing suggests that disaster has resulted. Indeed, a recent study reveals that mutual water companies still "dominate the water market in Colorado." Timothy D. Tregarthen, *Water in Colorado: Fear and Loathing of the Marketplace, in Water Rights: Scarce Resource Allocation, Bureaucracy, and the Environment* 119, 131 (Terry L. Anderson ed., 1983); *see also* Barton H. Thompson, Jr., *Institutional Perspectives on Water Policy and Markets*, 81 Cal.L.Rev. 671, 688 table 2 (1993) [hereinafter Thompson]. Further, the Colorado Supreme Court has reaffirmed its rule as recently as 1984. *See Great Western Sugar v. Jackson Lake Reservoir*, 681 P.2d 484 (Colo.1984). If "inextricable discord and confusion" were such an obvious result of allowing shareholders to make changes in their own points of diversion, certainly there would have been some sort of legislative response or judicial retrenchment in Colorado in the last eighty-five years.[7]

The engineer's order does not interfere with East Jordan's ability to "manage" the company water supply.[8] The order provides that both East Jordan and the Utah Lake and Jordan River commissioner have the right to inspect Payson's meter to ensure that the city does not take more than its share of water. It also provides that Payson's stock will remain liable for assessment to maintain East Jordan's canal and other company assets. East Jordan would still be able to sue in the name of its shareholders, object to claims that may impair its vested rights, and enter into exchange agreements it feels are in the best interests of the company. If there is a water shortage, East Jordan may limit the

---

7. I find it relevant that the state engineer was not persuaded by the concerns expressed by East Jordan and the majority. While the engineer's decision is not entitled to any deference on de novo review, it is worth noting that he is an expert in water distribution and deals often with mutual water corporations.

8. The majority also asserts, "Change in point of diversion certainly implicates management of water supply as a whole." Again, the majority does not provide any supporting analysis for this argument, nor can I see how this is so: The engineer's order provides that enough water will be diverted into East Jordan's canal to supply the remaining shareholders.

amount of water Payson takes through its well in the same proportion as the other shareholders. If Payson does not use its allotment, the water would be available to other shareholders, just as it would be if Payson were taking its water from the company canal. Payson would still be a shareholder in East Jordan, and East Jordan would still be the legal owner of the water rights. The only difference is that Payson would take water from its own well rather than from the company canal.[9]

Not only is the majority's holding contrary to Utah case law, but it is also bad policy. First, it will not actually increase East Jordan's control over its water supply. Payson will still be free to use its share of company water for municipal purposes. As discussed above, under *Baird* and *Syrett* the corporation must connect the shareholder to the company canal at any point the shareholder chooses, as long as it does not injure the corporation or the other shareholders. *Baird* also established that a shareholder may do whatever he or she wants with water once it is delivered. Thus, there is nothing East Jordan can do to prevent Payson from taking its water from the East Jordan canal and pumping it to the city. In my view, the majority's approach will increase the costs for every-

one involved without providing any benefits.

Further, preventing shareholders from changing their points of diversion interferes with the ability of water users to respond to new needs for water. Utah's population has been and is expected to continue growing at a substantial rate,[10] and there is not enough water available to meet the increasing demands in many parts of the state.[11] While in the past these concerns have been addressed by the construction of dams and large-scale water diversions, such projects are no longer as economically or politically feasible as they once were.[12] As the demand for water approaches the supply, the natural solution will be to seek transfers of water rights. Commentators agree that agricultural users are the most likely sources of water rights for transfer.[13]

This case presents a classic example. The person who sold the stock to Payson apparently decided that he or she could receive a higher return by selling the water rights than by using them for farming. Presumably, Payson likewise concluded that the returns from the new water exceeded the purchase and transfer costs and that purchase of East Jordan stock was

---

9. I do have one concern about the engineer's order, however. The order provides, "Any additional costs incurred by the Utah Lake and Jordan River Commissioner in the administration of the change application shall be borne by the applicant." I do not have any quarrel with this; however, Payson should be liable for any costs incurred by East Jordan as well. For example, if East Jordan has to spend more time and money monitoring Payson's well than it would to monitor withdrawals made from the company canal, it should be reimbursed for these additional costs. I therefore would direct that the engineer's order be modified to include this provision. As long as a shareholder is responsible for any additional costs incurred by a mutual water company due to changes in the shareholder's point of diversion, however, the shareholder has the right to make such a change without the consent of the corporation.

10. Utah's population is projected to increase to over 2.4 million by the year 2010. This would reflect a growth rate of 1.7 percent per year, more than double the national average. Utah Department of Natural Resources, State Water Plan § 4, at 4–2 to 4–6 (January 1990).

11. *See* Ray Jay Davis, *Utah Water Rights Transfer Law*, 31 Ariz.L.Rev. 841, 841–42 (1989) [hereinafter Davis].

12. A number of factors contribute to the decline of large-scale water projects: the optimal reservoir sites have been used, political pressure has made the federal government reluctant to grant huge subsidies for such projects, and public opposition to dams on environmental grounds has increased. Bonnie G. Colby, *Economic Impacts of Water Law—State Law and Water Market Development in the Southwest*, 28 Nat.Res.J. 721, 725 (Fall 1988) [hereinafter Colby].

13. *See, e.g.,* Steven J. Shupe et al., *Western Water Rights: The Era of Reallocation*, 29 Nat. Res.J. 413, 414 (Spring 1989); Colby at 724; Davis at 841–43; Thompson at 702. In Utah, agriculture accounts for over 90 percent of the consumptive use of water. U.S. Geological Survey, *National Water Summary 1987—Water Supply and Use: Utah* 491, 496 fig. 4 (U.S.G.S. Water–Supply Paper 2350).

**324**

more economically attractive than any other option. But by refusing to allow shareholders to change their points of diversion, the majority increases the cost of these transactions, perhaps to the point of making them prohibitive.

I do not mean to imply that economic efficiency is the sole consideration in water law or that transfers must be allowed without restrictions. One commentator has noted:

> It must be emphasized that policies which restrict market activities and make transactions more costly are not necessarily wasteful or inefficient. They are an expression of the concerns that members of society and policy makers have about reallocating water through market processes and they provide protection for third-parties who may be impacted by water transfers.

Bonnie G. Colby, *Economic Impacts of Water Law—State Law and Water Market Development in the Southwest,* 28 Nat.Res.J. 721, 722 (Fall 1988). There can be little doubt that social and environmental concerns should override economic efficiency in some situations.[14] I also believe that some protection should be provided for third parties affected by large-scale water transfers. However, the only interest served by the holding in this case is East Jordan's desire to have the water flow through its canal. Further, area-of-origin protections and other concerns implicated by large-scale water transfers should be handled by some sort of governmental entity rather than by a private corporation pursuing its own goals.[15]

The majority, driven by the unfounded and unsubstantiated fear that allowing shareholders to change their points of diversion will destroy Utah's water delivery systems, has overlooked crucial differences between the control of water in mutual water companies and the management of other forms of property in ordinary corporations. In its desire to prevent East Jordan's hypothetical "parade of horribles," it has also ignored years of Utah case law establishing that a shareholder in a mutual water corporation has a direct ownership interest in the water held in the corporation's name and the right to use such water however he or she sees fit, as long as the use does not harm the corporation. Finally, the majority assumes without adequate analysis that a change in a shareholder's point of diversion necessarily interferes with the corporation's ability to protect the interests of the shareholders as a whole. I therefore dissent.

---

**14.** I note that Utah Code Ann. § 73–3–8(1) provides that the state engineer shall reject an application for appropriation if the proposed plan "will prove detrimental to the public welfare." These same considerations apply to applications for permanent changes under Utah Code Ann. § 73–3–3. Utah Code Ann. § 73–3–3(5)(a); *Bonham v. Morgan,* 788 P.2d 497, 502 (Utah 1988) (per curiam).

**15.** The record reveals that East Jordan has allowed the Salt Lake County Water Conservancy District, which owns 2000 shares (20 percent) of company stock, to change the diversion of its 10,000 acre-feet of company water for delivery outside of East Jordan's service area.