Wesley BADGER, Ray Greenwood, Clay C. Paxton, Utah Land Inc., Kip Nielsen, John M. Lefevre, Thomas M. Lefevre, Susie Barney, Lorene B. Leak, Albert Lefevre, Grant Lefevre, Max A. Hintze, Carol Breinholt, Cornell Henrie, Mary Ann Curtis, and Jerry B. Lewis, Plaintiffs and Appellants,

v.

BROOKLYN CANAL COMPANY and Robert L. Morgan, State Engineer, Defendants and Appellees.

No. 940623.

Supreme Court of Utah.

July 23, 1996.

Paul M. Durham, G. Richard Hill, J. Mark Gibb, Salt Lake City, for plaintiffs.

Ken Chamberlain, Richfield, for Brooklyn Canal Co., Jan Graham, Att'y Gen., Michael M. Quealy, John H. Mabey, Jr., Asst. Att'ys Gen., Salt Lake City, for State Engineer.

STEWART, Associate Chief Justice:

This case is before us on appeal from the district court's review of a decision issued by the State Engineer. The State Engineer approved Brooklyn Canal Company's ("Brooklyn") application for a change in its diversion point on the Sevier River. Incident to an application for de novo review, the district court granted Brooklyn's motion for summary judgment against various plaintiffs who asserted claims either as shareholders in Brooklyn or as possessors of private well water rights and who collectively claimed that the change in diversion would be harmful to the public welfare.

## I. PROCEDURAL BACKGROUND

The dispute at issue arises out of a decision by the Brooklyn Canal Company to change its method of agricultural irrigation from a "flood" method to a high-pressure sprinkler method. Brooklyn is a nonprofit mutual water corporation formed for the purpose of distributing water to its shareholders in Sevier County. Brooklyn has traditionally distributed its water by means of the Brooklyn Canal to individual shareholders who have employed ditches and furrows to water their crops.[1] The canal draws most of

---

1. Apparently, some shareholders employed a small portion of their shares to provide water for cattle or other stock.

Brooklyn's water right directly from the Sevier River, but a small portion has also been drawn from several artesian wells. In early 1992, it was proposed that the irrigation method be changed.[2] At a shareholders' meeting held on February 18, 1992, the plan to switch to a pressurized sprinkler method was approved, with 72% of the shareholders present voting in favor of it.[3]

Switching to a pressurized sprinkler system apparently necessitated transferring water to an underground pipe linked to a diversion point several miles upstream from the diversion point that supplies the Brooklyn Canal. The State Engineer must approve any adjustment in a point of diversion of a water right. Consequently, Brooklyn filed a change application for approval of the proposed upstream diversion point. In that change application, Brooklyn proposed to divert its entire water right of 31.27 cubic feet per second from the Sevier River at the new upstream diversion point. Brooklyn has conceded that this change would require abandonment of the artesian wells.[4]

Several objections to the proposed change were filed. The State Engineer conducted a hearing on May 11, 1993, in Richfield, Utah. After receiving evidence submitted by Brooklyn and the various protestants, the State Engineer issued a memorandum decision approving the change in Brooklyn's diversion point. In that decision, the State Engineer referred to two concerns expressed by some of the protestants. First, they were con-

cerned about the cost of constructing the new distribution system and purchasing the high pressure sprinkler equipment required under the new method, and second, they were concerned that they would be deprived of artesian sources of warm water for stock watering during the winter months. The State Engineer considered these arguments and ruled that "[Brooklyn] has a valid right with which to make this change and that if the change is approved with conditions, downstream rights will not be impaired." The State Engineer did not directly address the protestants' concerns with respect to winter stock watering except to opine "that the applicant has the responsibility to deliver water to its stockholders."

A number of the protestants then filed for de novo review before the district court in accordance with Utah Code Ann. §§ 73–3–14 (1989) and 63–46b–15 (1989). Pursuant to § 73–3–14(2), the State Engineer was joined as a defendant. Relying solely on the pleadings, Brooklyn moved for summary judgment, asserting that plaintiffs had no standing as shareholders to contest Brooklyn's corporate decisions.[5] This motion was denied because the trial court was unsure about the status of various claimed water rights. Subsequent interrogatories revealed that some plaintiffs claimed that they possessed private well water rights that were apart from the artesian well water rights held by Brooklyn and unrelated to any rights they held as shareholders in Brooklyn.[6] These

---

2. Brooklyn claims that a central reason for switching to a sprinkler irrigation system is that it is more efficient than traditional flood irrigation. Brooklyn cites to this Court's holding in *Estate of Steed v. New Escalante Irrigation Co.,* 846 P.2d 1223 (Utah 1992):

> The evidence is to the effect that the pressurized sprinkler system is approximately 25 percent more efficient than flood-type irrigation. However, the new system does not make water. The system distributes an efficient application of the water, allowing the crops to consume more water. With a flood-type irrigation system, crops are somewhat over watered at the upper end and under watered at the lower end.

*Id.* at 1227. Certain plaintiffs, however, have asserted that more modern methods of flood irrigation, specifically the practice of precision (laser) leveling of land, can reach similar levels of efficiency.

3. *See Badger v. Madsen,* 896 P.2d 20, 21 (Utah Ct.App.1995).

4. Apparently, under the new plan the water from the artesian wells would no longer be utilized to satisfy a portion of Brooklyn's water right and would therefore be diverted directly into the river.

5. The parties to this litigation have generally characterized this issue as a question of whether plaintiffs have "standing" before the State Engineer or the district court. More accurately, however, the question addresses the authority or jurisdiction of the office of the State Engineer to consider and resolve the claims presented to it.

6. It appears, however, that all plaintiffs are represented by the same counsel. At least, there has been no allegation to the contrary, and the briefs

plaintiffs ("private well plaintiffs" [7]) asserted that Brooklyn's plan would lower the water table in the region of their wells, thus impairing their rights.

Brooklyn then submitted a second motion for summary judgment, asserting again that the shareholder plaintiffs had no standing to bring the suit and that the available facts demonstrated that the rights of the private well plaintiffs could not be adversely affected by simply changing the diversion point. In support of that proposition, Brooklyn submitted the affidavit of Myron Madsen, President of the Brooklyn Canal Company, which stated that the existing point of diversion was above all plaintiffs' lands and wells and that the new diversion point would be several miles further upstream and could not therefore affect downstream rights.

Responding to Brooklyn's second motion, the shareholder plaintiffs submitted several affidavits which they authored. In those affidavits, a number of shareholders complained that they could not afford to purchase the new equipment required, that the sprinkler system would preclude raising corn silage for dairy cows and cattle feed, and that they would be deprived of artesian sources of warm water for stock watering and domestic use during the winter months. They also argued that the proposed changes would harm the public interest by removing the Brooklyn Canal and its connecting ditches as potential flood control devices. In addition, some of the affidavits expressed concern about the law firm representing Brooklyn. The affiants claimed that various partners of Olsen, McIff & Chamberlain had represented some plaintiffs in previous matters and questioned the propriety of that firm's participation.

Brooklyn then submitted a reply brief accompanied by an affidavit executed by an expert witness, Gerald B. Robinson, Jr., on the issue of the impact of the proposed change on the water table supplying plaintiffs' private wells. Plaintiffs subsequently moved to disqualify Brooklyn's counsel and

to strike the Robinson affidavit or, in the alternative, for leave to file additional affidavits and an additional responsive brief.

The trial court held a hearing on December 14, 1994, and ruled on all pending motions. Ruling from the bench, the court denied plaintiffs' motion to disqualify Brooklyn's counsel and, without explanation, the motion to strike the Robinson affidavit. The court also granted Brooklyn's summary judgment motion, subsequently issuing a written order on motions and entry of summary judgment stating the grounds upon which it had based its decision. *See* Utah R.Civ.P. 52. That order stated that the court had granted the motion because (1) the shareholder plaintiffs did not have "standing" to protest Brooklyn's change application; (2) switching methods of irrigation does not require a change application; and (3) no material facts were in dispute indicating any reason to believe the change in point of diversion would impair the private well plaintiffs' rights. Plaintiffs now appeal the grant of summary judgment and the rulings respecting the motions to strike and to disqualify counsel.

In reviewing a district court's entry of summary judgment, we view the facts and inferences in the light most favorable to the nonmoving party. *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). We review the trial court's grant of summary judgment for correctness, according no deference to its conclusions of law. *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990).

We will first separately discuss the shareholder and the private well plaintiffs' claims of impairment of their vested rights. We will then briefly address the collective claims regarding detriment to the public welfare and the motion to disqualify Brooklyn's counsel.

## II. IMPAIRMENT OF THE SHAREHOLDER PLAINTIFFS' RIGHTS

With respect to their claims of vested rights, the shareholder plaintiffs assert that

submitted in this appeal have purported to represent all arguments available to various plaintiffs regardless of their status.

7. Brooklyn asserts that there are only three plaintiffs who claim to hold independent culinary and domestic well water rights: Kip Nielsen, Max A. Hintze, and Mary Ann Curtis.

they possess "vested real property rights which are represented by their individual shares of water stock." They thus claim to hold an independent water right apart from their status as mere shareholders in a mutual water corporation. For support, the shareholder plaintiffs rely upon *Salt Lake City Corp. v. Cahoon Irrigation Co.*, 879 P.2d 248, 252 (Utah 1994), in which we addressed the issue of whether stock in a mutual water corporation constituted a certificated security for purposes of Utah Code Ann. § 70A–8–102(1)(a), and we held that it did not. *Id.* at 252. In so holding, we noted that the formation of a mutual irrigation corporation "pooled [preexisting water] rights and created a vehicle for the distribution of the stockholder-owned water." *Id.* The shareholder plaintiffs argue that *Cahoon* supports their claim that they possess independent water rights entitling them to contest a change application before the State Engineer.

Our statement in *Cahoon*, however, must be read not only in the context of the question it resolved, but in light of other—and to the present dispute more pertinent—case law. *Cahoon* addressed the question of whether stock in a mutual water corporation more closely resembled a security held for the purposes of investment or a certificate representing a real property right. In ruling that it represented the latter, we did not address the issue of a shareholder's right to protest applications before the State Engineer. Thus *Cahoon* has limited utility in answering that question.

■ Our holding in *East Jordan Irrigation Co. v. Morgan*, 860 P.2d 310, 316 (Utah 1993), on the other hand, directly addressed the issue of a shareholder's rights to act in derogation of a water corporation's policy. *East Jordan* held that a shareholder did not have the right to file a change application without corporate consent. *Id.* We quoted with approval a California case which summarized the difficulties inherent in treating shareholder rights as independent water rights:

"[I]t would seem to be too clear for argument that neither one nor any number of such stockholders would or could possess the legal right to take or receive the amount of water to which [they] may be entitled by another manner or means than those supplied by the corporation itself." To recognize such a right "would necessarily be to admit the possession of similar rights in each and every stockholder in each of said corporations to go and do likewise, and it is too plain for argument that such an admission would result in a state of inextricable discord and confusion among the owners of water rights of various sorts.... The creation or threatened danger of such a consequence would of itself supply a sufficient reason for the use of the injunctive processes of the court in the way of its prevention."

*Id.* at 315 (citations omitted) (quoting *Consolidated Peoples Ditch Co. v. Foothill Ditch Co.*, 205 Cal. 54, 269 P. 915, 920–21 (1928)).

Given these prudential concerns, there is no reason for drawing a distinction, as the shareholder plaintiffs request us to do, between the right to file a change application and the right to contest one. Permitting either would lead to the same "state of inextricable discord and confusion" and would nullify the ability of mutual water or irrigation corporations to act as a cohesive unit for the benefit of their shareholders.

In this regard, our decision in *East Jordan* accords with *Cahoon. Cahoon* noted that the formation of an irrigation corporation constituted a "contract between the shareholders for the pooling and distribution of water." Acknowledgment of the legal relationship of a water company and its shareholders necessarily implicates both benefits and burdens. Where individual holders of water rights might meet insuperable obstacles in attempting to maintain their own diversion points and canal or pipe systems for distribution, the pooling of resources under a contractual corporate system permits many individuals to benefit from the resources available through unified action.

Unified action also necessarily entails a certain sacrifice of the autonomy an individual shareholder could retain by refusing to take on the burdens and obligations accompanying the benefits of participating in a corporate body. Where, for instance, the governance of a mutual water corporation

dictates that a majority vote of the shareholders will control the obligations of all, individuals who do not agree with the majority will always suffer a certain detriment simply by virtue of their position in the minority.[8] That is the nature of the legal relationship undertaken. Were we to adopt the reasoning proposed by plaintiffs, shareholders could evade their obligations, which would result in an unacceptable interference with the constitution and maintenance of mutual water corporations.

■ Perhaps even more critical, adoption of the shareholder plaintiffs' argument would impermissibly expand the authority of the State Engineer. Assuming Brooklyn has violated any enforceable obligations it owes to its shareholders with respect to manner, mode, or quantity of delivery, then those shareholders possess a cause of action in a court of competent jurisdiction. Apparently, the plaintiffs in this case have already filed such an action. *See Badger v. Madsen,* 896 P.2d 20, 21–22 (Utah Ct.App.1995). Although the State Engineer would not necessarily be required to adjudicate the specific obligations of the corporation vis-a-vis its shareholders, the Engineer's treatment of the shareholders' rights in any context would necessarily interfere with the authority of the court that *was* required to adjudicate those obligations. For example, assume hypothetical plaintiffs take their case before a district court and that court determines that the corporation has not violated its obligations. If the State Engineer simultaneously or subsequently determines that plaintiffs have suffered an impairment of their rights, then the

effect of the district court's ruling could be called into question. We cannot require the State Engineer's office to assume a role which thus undermines the jurisdiction of the courts.

■ These prudential policy concerns also accord with the intent and the language of the statute at issue. The context of the entire statute [9] makes it clear that the State Engineer does not have the authority to adjudicate all the issues that may arise in the context of a change application. A change application is required for a change in place of diversion, place of use, or purpose of use, but no such change may be made "if it impairs any vested right without just compensation." Utah Code Ann. § 73–3–3(2). The Code further provides, "The state engineer shall follow the same procedures, and the rights and duties of the applicants with respect to applications for permanent changes of point of diversion, place, or purpose of use shall be the same, as provided in this title for applications to appropriate water." *Id.* § 73–3–3(5)(a). With respect to change applications, the jurisdiction of the State Engineer's office is thus circumscribed by the criteria upon which the statute permits it to base its decisions. Those criteria are largely set forth in § 73–3–8(1), which states in relevant part:

> It shall be the duty of the state engineer to approve an application if: (a) there is unappropriated water in the proposed source; (b) the proposed use will not impair existing rights or interfere with the more beneficial use of the water; (c) the proposed plan is physically and economi-

---

8. Those who choose to participate must be aware of this possibility, and if they find it unacceptable, they must either choose not to participate or they must attempt to change the provisions of corporate government to allow them to veto or refuse to participate in plans they do not individually approve.

9. The shareholder plaintiffs also claim that a statutory justification for their argument can be found in the relatively broad language of the ·provision that pertains to the filing of protests to change applications. Utah Code Ann. § 73–3–7, at the time the change application was submitted, provided as follows:

> (1) Any person interested may, at any time within 30 days after notice is published, file a protest with the State Engineer.
> (2) The State Engineer shall consider the protest and shall approve or reject the application.

Although this provision does appear to acknowledge the wide range of interests and impacts relating to allocation and adjustment of water rights, it does not create in any "interested" person a vested right to protest and subsequent entitlement to appeal. Rather it simply allows those persons who have a genuine concern about proposed changes in water rights to voice those concerns before the State Engineer and, as an important corollary, provides the State Engineer with all viewpoints relevant to any proposal.

cally feasible ... and would not prove detrimental to the public welfare; (d) the applicant has the financial ability to complete the proposed works; and (e) the application was filed in good faith and not for purposes of speculation or monopoly.[10] In this respect, the shareholder plaintiffs essentially argue that they possess individual rights which are protected as "existing rights" by § 73–3–8(1).

■ Clearly, the shareholder plaintiffs' rights are necessarily intertwined with the rights of the corporation of which they are shareholders and to which they have contractually delegated the authority to act on their behalf. The right and ability of the majority of shareholders to manage their own rights in a collective manner is dependent upon the ability of the corporation to function as a unified organization. If we were to accept the interpretation proposed by the shareholder plaintiffs, minority shareholder "existing rights" would be elevated above the "existing rights" of majority shareholders. We do not believe that the legislature intended such an anomalous result. We therefore hold that in the context of mutual water or irrigation corporations, "existing rights," as that term is employed by § 73–3–8, refers to the right held by the corporation representing its shareholders as a body. Therefore, the statutory authority of the State Engineer does not extend to the resolution of disputes between shareholders and their corporations regarding the distribution of their shares. It follows that because the statutory authority of the State Engineer does not include jurisdiction over cases more properly presented in other forums, the district court correctly refused to address plaintiffs' shareholder rights on de novo review.

### III. IMPAIRMENT OF PRIVATE WELL WATER RIGHTS

The private well plaintiffs, on the other hand, have articulated claims which, if valid, would clearly entitle them to the full benefits of the statute. However, it is not apparent that those plaintiffs ever made the State Engineer aware of their claims. In *S & G Inc. v. Morgan,* 797 P.2d 1085, 1088 (Utah 1990), we held that failure to make known one's vested rights before the State Engineer constitutes a waiver of those rights. The plaintiff in *S & G Inc.* failed to appear before the State Engineer and was therefore precluded from raising any claims on de novo review before the district court. In that case, we held that "persons aggrieved by decisions of administrative agencies 'may not, by refusing or neglecting to submit issues of fact to such agencies, by-pass them, and call upon the courts to determine ... matters properly determinable originally by such agencies.'" *Id.* at 1087 (quoting *People v. Keith Ry. Equip. Co.,* 70 Cal.App.2d 339, 161 P.2d 244, 249 (1945)).

■ Likewise, in this case, although it appears that the private well plaintiffs did sign the initial protest to the change application, no facts have been established to demonstrate that those plaintiffs articulated their concerns, either in the protest application or at the hearing before the State Engineer. In fact, the available record gives no indication that the State Engineer was even given notice of the existence of the private well plaintiffs' water rights. Although it may be inappropriate to impose the same level of strict waiver analysis that we have applied to issues or objections not raised before a trial court, the failure to make known the nature of one's rights in the course of an administrative proceeding clearly disentitles a party from raising its claim for the first time before a district court on de novo review. *S & G Inc.,* 797 P.2d at 1085.

Nevertheless, on this record we are unable to dispositively determine whether the private well plaintiffs in fact failed to make known the nature of their claims. The proceedings before the State Engineer were preserved on a tape recording,[11] but that

---

10. Conversely, the State Engineer has a duty to withhold approval if it appears there is reason to believe that the enumerated requirements have *not been met, and ultimately to deny the applica-*tion if further investigation more conclusively reveals the same.

11. Pursuant to the request of this Court, the State Engineer submitted the official tapes of the hearing and a transcript of those tapes. Plaintiffs submitted copies of the tapes and a partial transcript. For purposes of our review, refer-

recording contains gaps and appears to be otherwise incomplete in some respects. Moreover, because apparently none of the parties addressed the issue before the district court and the district court did not perceive it as a concern, no factual findings regarding it were made. Therefore, this issue must be considered by the district court on remand.

Instead of treating the waiver issue, the district court treated the issue of the private well plaintiffs' rights as if they were properly before the court. Addressing Brooklyn's second motion for summary judgment, the court found that, as a matter of law, there was no reason to believe the change in point of diversion would impair the private well plaintiffs' rights. On that motion, Brooklyn submitted an affidavit by Myron Madsen, who averred no particular expertise other than lengthy personal experience as an irrigator. He asserted that both the present point of diversion and the contemplated point of diversion were upstream from any of the plaintiffs' wells and that, consequently, no diminution in the water table could occur solely due to the change in point of diversion.

Plaintiffs' answer to the summary judgment motion was accompanied by several affidavits, likewise offered by persons whose asserted expertise was derived from their personal experience as irrigators. Some of the affidavits stated that a local pond varies significantly in its level when nearby land is being flood irrigated. Plaintiffs relied on this fact to support their argument that the water table underlying and replenishing the wells in question was affected by water seepage from flood irrigation, the Brooklyn canal, and its connecting ditches. However, none of the affidavits stated any facts describing how merely changing the point of diversion, apart from changing the nature of the irrigation, would affect the water table feeding the private wells.

Brooklyn responded with a reply brief accompanied by an affidavit from Gerald B. Robinson. Robinson represented that he was a geologist and a hydrology and hydraulics engineer with extensive knowledge of water tables in the Sevier River Basin. Robinson asserted that on the basis of the direction of underground water flow and the positioning of plaintiffs' privately owned wells, those wells could not be adversely affected by the proposed change in diversion point.

■ We find that the manner in which these affidavits were presented provided an insufficient factual basis for the district court's ruling. Ordinarily, the opponent to a summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Utah R.Civ.P. 56(e). However, that burden is triggered only when "a motion for summary judgment is made *and supported as provided in this rule.*" *Id.* (emphasis added). "Unless the moving party meets its initial burden to present evidence establishing that no genuine issue of material fact exists, 'the party opposing the motion is under no obligation to demonstrate that there is a genuine issue for trial.'" *Harline v. Barker,* 912 P.2d 433, 445 (Utah 1996) (quoting *K & T, Inc. v. Koroulis,* 888 P.2d 623, 628 (Utah 1994)). The Madsen affidavit failed to negate any disputed issue regarding the impact of the change in diversion points on the private wells. Whatever expertise Madsen had acquired as an irrigator, it was not plainly pertinent to the question of impact on water tables; nor did he provide any foundational facts supporting his opinion. *See, e.g., King v. Searle Pharmaceuticals, Inc.,* 832 P.2d 858, 864 n. 2 (Utah 1992) ("Affidavits of experts are insufficient . . . unless foundational facts are set forth supporting their opinions and conclusions"). Rather, he simply asserted in conclusory fashion that movement of water upstream could not impact the water table near plaintiffs' wells. Thus, although the affidavits plaintiffs submitted with their response made equally conclusory statements, they had no obligation to provide more.

Brooklyn's reply brief, on the other hand, was accompanied by the Robinson affidavit, which specifically addressed, with otherwise appropriate expert testimony, the potential impacts of the change application on the private well plaintiffs' water rights. Plaintiffs responded by moving to strike the Rob-

ence is made to the materials submitted by the State Engineer.

inson affidavit or, in the alternative, to allow them to file a supplemental affidavit. This motion was denied without explanation by the trial court. Plaintiffs argued that under Rule 4–501 of the Utah Code of Judicial Administration, Brooklyn was not entitled to file affidavits with its reply brief and that they themselves could not file additional affidavits without obtaining leave of the court.

We find *no justification for plaintiffs'* interpretation of Rule 4–501. Nevertheless, because Brooklyn failed to "present evidence establishing that no genuine issue of material fact exist[ed]," *Harline,* 912 P.2d at 445, in its initial brief, waiting instead to present that evidence in its reply brief, we hold that it was an abuse of discretion for the trial court to refuse plaintiffs' request for leave to file a supplemental affidavit.[12]

We therefore remand this issue to the district court. If the district court finds that the private well plaintiffs failed to make known the existence of their water rights before the State Engineer, then plaintiffs waived the right to present their claims on de novo review and the district court need not address the merits of the parties' arguments. If, on the other hand, those claims *were not waived, then we direct the district court to reconsider Brooklyn's motion for summary judgment in light of all pertinent evidence on the issue, including any affidavits the private well plaintiffs may present to rebut the Robinson affidavit.

## IV. DETRIMENT TO THE PUBLIC WELFARE AND PLAINTIFFS' MOTION TO DISQUALIFY BROOKLYN'S COUNSEL

We conclude by addressing plaintiffs' claims regarding detriment to the public welfare and plaintiffs' motion to disqualify Brooklyn's counsel. Plaintiffs allege that Brooklyn's proposed change will harm the public welfare in three respects: (1) the change from flood to sprinkler irrigation will preclude the raising of corn silage locally employed to feed livestock; (2) the change will harm local residents who rely on the warm artesian wells for winter stock watering;[13] and (3) the change will render the Brooklyn Canal system unavailable for flood management.

None of these claims, however, was cognizable before the State Engineer. The ability to raise corn silage and the loss of the artesian wells are matters related to Brooklyn's obligations to its shareholders which the State Engineer had no authority to treat. The argument that the loss of the canal system will harm flood management capability is speculative and, if accepted, would set a dangerous precedent for future administrative proceedings relating to mutual water corporations. That argument assumes that once a canal system is established, the administrator of the system is necessarily obligated to maintain that system in the public interest. Although there may be rare situations where unique circumstances might dictate such a policy, a holding of the nature plaintiffs propose here would seriously infringe upon the ability of canal owners to make necessary adjustments to their water delivery systems and would discourage innovation and flexibility in the matter of distributing the precious commodity of water in an arid state. *We therefore affirm the district court's grant of summary judgment on these issues.

With respect to plaintiffs' contention that the trial court abused its discretion in

---

12. The record does not indicate whether plaintiffs had indeed prepared a pertinent affidavit by a qualified expert sufficient to create a disputed issue of material fact. In our opinion, plaintiffs should have attempted to submit their affidavit or requested an earlier ruling on their motion rather than simply waiting for the trial court to rule on all summary judgment issues simultaneously. Failure to make some effort in this regard verged on invited error because if the trial court had granted plaintiffs' motion, it then may well have been required to grant a continuance as a consequence. The trial court may have been justifiably reluctant to do so. Nevertheless, the

trial court failed to state any basis for its decision with respect to the motion for leave to file the supplemental affidavit, and the record even implies that the court simply ignored it. Because we cannot speculate on the reasons for the trial court's decision or lack thereof, we feel it more prudent to remand this issue for fuller consideration in light of the pertinent evidence mustered by both parties.

13. Apparently, some local nonshareholders have contracted with shareholders for limited use of this water.

refusing to disqualify Brooklyn's counsel, we affirm. Before the trial court, plaintiffs asserted that various attorneys associated with the firm of Olsen, McIff & Chamberlain had represented some of the plaintiffs primarily on financial planning matters and had apparently given some legal advice a number of years earlier relating to rights attached to the Brooklyn Canal. The trial court denied the motion, stating that plaintiffs had failed to bring their motion in a timely manner. In light of the absence of any record evidence of a conflict stemming from representation on a "substantially factually related matter," *see* Utah R. Professional Conduct 1.9, or any other actual impropriety, we hold that the trial court's denial of the motion did not constitute an abuse of discretion.

## V.  CONCLUSION

In summary, we affirm the district court with respect to its rulings as to the various allegations of detriment to the public welfare and as to the plaintiffs whose claims are solely based upon their status as shareholders in the Brooklyn Canal Company. With respect to the plaintiffs who claim private well water rights, we reverse and remand for entry of further factual findings.

ZIMMERMAN, C.J., and HOWE, DURHAM and RUSSON, JJ., concur in the opinion of STEWART, Associate C.J.